REVLON, INC., a Delaware corporation, Michel C. Bergerac, Simon Aldewereld, Sander P. Alexander, Jay I. Bennett, Irving J. Bottner, Jacob Burns, Lewis L. Glucksman, John Loudon, Aileen Mehle, Samuel L. Simmons, Ian R. Wilson, Paul P. Woolard, Ezra K. Zilkha, Forstmann Little & Co., a New York limited partnership, and Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership-II, a New York limited partnership, Defendants Below, Appellants,

v.

MacANDREWS & FORBES HOLDINGS, INC., a Delaware corporation, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Oct. 31, 1985.

Oral Decision: Nov. 1, 1985.

Written Opinion: March 13, 1986.

174

A. Gilchrist Sparks, III (argued), Lawrence A. Hamermesh, and Kenneth Nachbar, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Herbert M. Wachtell,

Douglas S. Liebhafsky, Kenneth B. Forrest, and Theodore N. Mirvis, of Wachtell, Lipton, Rosen & Katz, New York City, of counsel, for appellant Revlon.

Michael D. Goldman, James F. Burnett, Donald J. Wolfe, Jr., Richard L. Horwitz, of Potter, Anderson & Corroon, Wilmington, and Leon Silverman (argued), and Marc P. Cherno, of Fried, Frank, Harris, Shriver & Jacobson, New York City, of counsel, for appellant Forstmann Little.

Bruce M. Stargatt (argued), Edward B. Maxwell, 2nd, David C. McBride, Josy W. Ingersoll, of Young, Conaway, Stargatt & Taylor, Wilmington, and Stuart L. Shapiro (argued), Stephen P. Lamb, Andrew J. Turezyn, and Thomas P. White, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, and Michael W. Mitchell (New York City) and Marc B. Tucker, Washington, D.C., of Skadden, Arps, Slate, Meagher & Flom, for appellee.

Before McNEILLY and MOORE, JJ., and BALICK, Judge (Sitting by designation pursuant to Del. Const., Art. IV, § 12.).

MOORE, Justice:

In this battle for corporate control of Revlon, Inc. (Revlon), the Court of Chancery enjoined certain transactions designed to thwart the efforts of Pantry Pride, Inc. (Pantry Pride) to acquire Revlon.[1] The defendants are Revlon, its board of directors, and Forstmann Little & Co. and the latter's affiliated limited partnership (collectively, Forstmann). The injunction barred consummation of an option granted Forstmann to purchase certain Revlon assets (the lockup option), a promise by Revlon to deal exclusively with Forstmann in the face of a takeover (the no-shop provision), and the payment of a $25 million cancellation fee to Forstmann if the transaction was aborted. The Court of Chancery found that the Revlon directors had breached their duty of care by entering into the foregoing transac-

1. The nominal plaintiff, MacAndrews & Forbes Holdings, Inc., is the controlling stockholder of Pantry Pride. For all practical purposes their interests in this litigation are virtually identical, and we hereafter will refer to Pantry Pride as the plaintiff.

tions and effectively ending an active auction for the company. The trial court ruled that such arrangements are not illegal *per se* under Delaware law, but that their use under the circumstances here was impermissible. We agree. *See MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, Del. Ch., 501 A.2d 1239 (1985). Thus, we granted this expedited interlocutory appeal to consider for the first time the validity of such defensive measures in the face of an active bidding contest for corporate control.[2] Additionally, we address for the first time the extent to which a corporation may consider the impact of a takeover threat on constituencies other than shareholders. *See Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 955 (1985).

In our view, lock-ups and related agreements are permitted under Delaware law where their adoption is untainted by director interest or other breaches of fiduciary duty. The actions taken by the Revlon directors, however, did not meet this standard. Moreover, while concern for various corporate constituencies is proper when addressing a takeover threat, that principle is limited by the requirement that there be some rationally related benefit accruing to the stockholders. We find no such benefit here.

Thus, under all the circumstances we must agree with the Court of Chancery that the enjoined Revlon defensive measures were inconsistent with the directors' duties to the stockholders. Accordingly, we affirm.

**I.**

The somewhat complex maneuvers of the parties necessitate a rather detailed examination of the facts. The prelude to this controversy began in June 1985, when Ronald O. Perelman, chairman of the board and chief executive officer of Pantry Pride, met with his counterpart at Revlon, Michel C. Bergerac, to discuss a friendly acquisition of Revlon by Pantry Pride. Perelman suggested a price in the range of $40–50 per share, but the meeting ended with Bergerac dismissing those figures as considerably below Revlon's intrinsic value. All subsequent Pantry Pride overtures were rebuffed, perhaps in part based on Mr. Bergerac's strong personal antipathy to Mr. Perelman.

Thus, on August 14, Pantry Pride's board authorized Perelman to acquire Revlon, either through negotiation in the $42–$43 per share range, or by making a hostile tender offer at $45. Perelman then met with Bergerac and outlined Pantry Pride's alternate approaches. Bergerac remained adamantly opposed to such schemes and conditioned any further discussions of the matter on Pantry Pride executing a standstill agreement prohibiting it from acquiring Revlon without the latter's prior approval.

On August 19, the Revlon board met specially to consider the impending threat of a hostile bid by Pantry Pride.[3] At the meeting, Lazard Freres, Revlon's invest-

**2.** This appeal was heard on an expedited basis in light of the pending Pantry Pride offer and the Revlon-Forstmann transactions. We accepted the appeal on Friday, October 25, 1985, received the parties' opening briefs on October 28, their reply briefs on October 29, and heard argument on Thursday, October 31. We announced our decision to affirm in an oral ruling in open court at 9:00 a.m. on Friday, November 1, with the proviso that this more detailed written opinion would follow in due course.

**3.** There were 14 directors on the Revlon board. Six of them held senior management positions with the company, and two others held significant blocks of its stock. Four of the remaining six directors were associated at some point with entities that had various business relationships with Revlon. On the basis of this limited record, however, we cannot conclude that this board is entitled to certain presumptions that generally attach to the decisions of a board whose majority consists of truly outside independent directors. *See Polk v. Good & Texaco*, Del.Supr., —— A.2d ——, —— (1986); *Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346, 1356 (1985); *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 955 (1985); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 812, 815 (1984); *Puma v. Marriott*, Del. Ch., 283 A.2d 693, 695 (1971).

ment banker, advised the directors that $45 per share was a grossly inadequate price for the company. Felix Rohatyn and William Loomis of Lazard Freres explained to the board that Pantry Pride's financial strategy for acquiring Revlon would be through "junk bond" financing followed by a break-up of Revlon and the disposition of its assets. With proper timing, according to the experts, such transactions could produce a return to Pantry Pride of $60 to $70 per share, while a sale of the company as a whole would be in the "mid 50" dollar range. Martin Lipton, special counsel for Revlon, recommended two defensive measures: first, that the company repurchase up to 5 million of its nearly 30 million outstanding shares; and second, that it adopt a Note Purchase Rights Plan. Under this plan, each Revlon shareholder would receive as a dividend one Note Purchase Right (the Rights) for each share of common stock, with the Rights entitling the holder to exchange one common share for a $65 principal Revlon note at 12% interest with a one-year maturity. The Rights would become effective whenever anyone acquired beneficial ownership of 20% or more of Revlon's shares, unless the purchaser acquired all the company's stock for cash at $65 or more per share. In addition, the Rights would not be available to the acquiror, and prior to the 20% triggering event the Revlon board could redeem the rights for 10 cents each. Both proposals were unanimously adopted.

Pantry Pride made its first hostile move on August 23 with a cash tender offer for any and all shares of Revlon at $47.50 per common share and $26.67 per preferred share, subject to (1) Pantry Pride's obtaining financing for the purchase, and (2) the Rights being redeemed, rescinded or voided.

The Revlon board met again on August 26. The directors advised the stockholders to reject the offer. Further defensive mea-

sures also were planned. On August 29, Revlon commenced its own offer for up to 10 million shares, exchanging for each share of common stock tendered one Senior Subordinated Note (the Notes) of $47.50 principal at 11.75% interest, due 1995, and one-tenth of a share of $9.00 Cumulative Convertible Exchangeable Preferred Stock valued at $100 per share. Lazard Freres opined that the notes would trade at their face value on a fully distributed basis.[4] Revlon stockholders tendered 87 percent of the outstanding shares (approximately 33 million), and the company accepted the full 10 million shares on a pro rata basis. The new Notes contained covenants which limited Revlon's ability to incur additional debt, sell assets, or pay dividends unless otherwise approved by the "independent" (non-management) members of the board.

At this point, both the Rights and the Note covenants stymied Pantry Pride's attempted takeover. The next move came on September 16, when Pantry Pride announced a new tender offer at $42 per share, conditioned upon receiving at least 90% of the outstanding stock. Pantry Pride also indicated that it would consider buying less than 90%, and at an increased price, if Revlon removed the impeding Rights. While this offer was lower on its face than the earlier $47.50 proposal, Revlon's investment banker, Lazard Freres, described the two bids as essentially equal in view of the completed exchange offer.

The Revlon board held a regularly scheduled meeting on September 24. The directors rejected the latest Pantry Pride offer and authorized management to negotiate with other parties interested in acquiring Revlon. Pantry Pride remained determined in its efforts and continued to make cash bids for the company, offering $50 per share on September 27, and raising its bid to $53 on October 1, and then to $56.25 on October 7.

---

4. Like bonds, the Notes actually were issued in denominations of $1,000 and integral multiples thereof. A separate certificate was issued in a total principal amount equal to the remaining sum to which a stockholder was entitled. Likewise, in the esoteric parlance of bond dealers, a Note trading at par ($1,000) would be quoted on the market at 100.

178

In the meantime, Revlon's negotiations with Forstmann and the investment group Adler & Shaykin had produced results. The Revlon directors met on October 3 to consider Pantry Pride's $53 bid and to examine possible alternatives to the offer. Both Forstmann and Adler & Shaykin made certain proposals to the board. As a result, the directors unanimously agreed to a leveraged buyout by Forstmann. The terms of this accord were as follows: each stockholder would get $56 cash per share; management would purchase stock in the new company by the exercise of their Revlon "golden parachutes";[5] Forstmann would assume Revlon's $475 million debt incurred by the issuance of the Notes; and Revlon would redeem the Rights and waive the Notes covenants for Forstmann or in connection with any other offer superior to Forstmann's. The board did not actually remove the covenants at the October 3 meeting, because Forstmann then lacked a firm commitment on its financing, but accepted the Forstmann capital structure, and indicated that the outside directors would waive the covenants in due course. Part of Forstmann's plan was to sell Revlon's Norcliff Thayer and Reheis divisions to American Home Products for $335 million. Before the merger, Revlon was to sell its cosmetics and fragrance division to Adler & Shaykin for $905 million. These transactions would facilitate the purchase by Forstmann or any other acquiror of Revlon.

When the merger, and thus the waiver of the Notes covenants, was announced, the market value of these securities began to fall. The Notes, which originally traded near par, around 100, dropped to 87.50 by October 8. One director later reported (at the October 12 meeting) a "deluge" of telephone calls from irate noteholders, and on October 10 the Wall Street Journal reported threats of litigation by these creditors.

Pantry Pride countered with a new proposal on October 7, raising its $53 offer to $56.25, subject to nullification of the Rights, a waiver of the Notes covenants, and the election of three Pantry Pride directors to the Revlon board. On October 9, representatives of Pantry Pride, Forstmann and Revlon conferred in an attempt to negotiate the fate of Revlon, but could not reach agreement. At this meeting Pantry Pride announced that it would engage in fractional bidding and top any Forstmann offer by a slightly higher one. It is also significant that Forstmann, to Pantry Pride's exclusion, had been made privy to certain Revlon financial data. Thus, the parties were not negotiating on equal terms.

Again privately armed with Revlon data, Forstmann met on October 11 with Revlon's special counsel and investment banker. On October 12, Forstmann made a new $57.25 per share offer, based on several conditions.[6] The principal demand was a lock-up option to purchase Revlon's Vision Care and National Health Laboratories divisions for $525 million, some $100–$175 million below the value ascribed to them by Lazard Freres, if another acquiror got 40% of Revlon's shares. Revlon also was required to accept a no-shop provision. The Rights and Notes covenants had to be removed as in the October 3 agreement. There would be a $25 million cancellation fee to be placed in escrow, and released to Forstmann if the new agreement terminated or if another acquiror got more than 19.9% of Revlon's stock. Finally, there would be no participation by Revlon management in the merger. In return, Forstmann agreed to support the par value

5. In the takeover context "golden parachutes" generally are understood to be termination agreements providing substantial bonuses and other benefits for managers and certain directors upon a change in control of a company.

6. Forstmann's $57.25 offer ostensibly is worth $1 more than Pantry Pride's $56.25 bid. However, the Pantry Pride offer was immediate, while the Forstmann proposal must be discounted for the time value of money because of the delay in approving the merger and consummating the transaction. The exact difference between the two bids was an unsettled point of contention even at oral argument.

of the Notes, which had faltered in the market, by an exchange of new notes. Forstmann also demanded immediate acceptance of its offer, or it would be withdrawn. The board unanimously approved Forstmann's proposal because: (1) it was for a higher price than the Pantry Pride bid, (2) it protected the noteholders, and (3) Forstmann's financing was firmly in place.[7] The board further agreed to redeem the rights and waive the covenants on the preferred stock in response to any offer above $57 cash per share. The covenants were waived, contingent upon receipt of an investment banking opinion that the Notes would trade near par value once the offer was consummated.

Pantry Pride, which had initially sought injunctive relief from the Rights plan on August 22, filed an amended complaint on October 14 challenging the lock-up, the cancellation fee, and the exercise of the Rights and the Notes covenants. Pantry Pride also sought a temporary restraining order to prevent Revlon from placing any assets in escrow or transferring them to Forstmann. Moreover, on October 22, Pantry Pride again raised its bid, with a cash offer of $58 per share conditioned upon nullification of the Rights, waiver of the covenants, and an injunction of the Forstmann lock-up.

On October 15, the Court of Chancery prohibited the further transfer of assets, and eight days later enjoined the lock-up, no-shop, and cancellation fee provisions of the agreement. The trial court concluded that the Revlon directors had breached their duty of loyalty by making concessions to Forstmann, out of concern for their lia-

bility to the noteholders, rather than maximizing the sale price of the company for the stockholders' benefit. *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.*, 501 A.2d at 1249–50.

## II.

To obtain a preliminary injunction, a plaintiff must demonstrate both a reasonable probability of success on the merits and some irreparable harm which will occur absent the injunction. *Gimbel v. Signal Companies*, Del.Ch., 316 A.2d 599, 602 (1974), *aff'd*, Del.Supr., 316 A.2d 619 (1974). Additionally, the Court shall balance the conveniences of and possible injuries to the parties. *Id.*

### A.

We turn first to Pantry Pride's probability of success on the merits. The ultimate responsibility for managing the business and affairs of a corporation falls on its board of directors. 8 *Del.C.* § 141(a).[8] In discharging this function the directors owe fiduciary duties of care and loyalty to the corporation and its shareholders. *Guth v. Loft, Inc.*, 23 Del.Supr. 255, 5 A.2d 503, 510 (1939); *Aronson v. Lewis*, Del.Supr., 473 A.2d 805, 811 (1984). These principles apply with equal force when a board approves a corporate merger pursuant to 8 *Del.C.* § 251(b);[9] *Smith v. Van Gorkom*, Del.Supr., 488 A.2d 858, 873 (1985); and of course they are the bedrock of our law regarding corporate takeover issues. *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 624 (1984); *Unocal Corp. v. Mesa*

---

7. Actually, at this time about $400 million of Forstmann's funding was still subject to two investment banks using their "best efforts" to organize a syndicate to provide the balance. Pantry Pride's entire financing was not firmly committed at this point either, although Pantry Pride represented in an October 11 letter to Lazard Freres that its investment banker, Drexel Burnham Lambert, was highly confident of its ability to raise the balance of $350 million. Drexel Burnham had a firm commitment for this sum by October 18.

8. The pertinent provision of the statute is:

(a) The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter or in its certificate of incorporation. 8 *Del.C.* § 141(a).

9. The statute provides in pertinent part:

(b) The board of directors of each corporation which desires to merge or consolidate shall adopt a resolution approving an agreement of merger or consolidation. 8 *Del.C.* § 251(b).

*Petroleum Co.*, Del.Supr., 493 A.2d 946, 953, 955 (1985); *Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346, 1350 (1985). While the business judgment rule may be applicable to the actions of corporate directors responding to takeover threats, the principles upon which it is founded—care, loyalty and independence—must first be satisfied.[10] *Aronson v. Lewis*, 473 A.2d at 812.

■ If the business judgment rule applies, there is a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis*, 473 A.2d at 812. However, when a board implements anti-takeover measures there arises "the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders ..." *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d at 954. This potential for conflict places upon the directors the burden of proving that they had reasonable grounds for believing there was a danger to corporate policy and effectiveness, a burden satisfied by a showing of good faith and reasonable investigation. *Id.* at 955. In addition, the directors must analyze the nature of the takeover and its effect on the corporation in order to

ensure balance—that the responsive action taken is reasonable in relation to the threat posed. *Id.*

**B.**

■ The first relevant defensive measure adopted by the Revlon board was the Rights Plan, which would be considered a "poison pill" in the current language of corporate takeovers—a plan by which shareholders receive the right to be bought out by the corporation at a substantial premium on the occurrence of a stated triggering event. *See generally Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346 (1985). By 8 *Del.C.* §§ 141 and 122(13),[11] the board clearly had the power to adopt the measure. *See Moran v. Household International, Inc.*, 500 A.2d at 1351. Thus, the focus becomes one of reasonableness and purpose.

■ The Revlon board approved the Rights Plan in the face of an impending hostile takeover bid by Pantry Pride at $45 per share, a price which Revlon reasonably concluded was grossly inadequate. Lazard Freres had so advised the directors, and had also informed them that Pantry Pride was a small, highly leveraged company bent on a "bust-up" takeover by using "junk bond" financing to buy Revlon cheaply, sell the acquired assets to pay the

**10.** One eminent corporate commentator has drawn a distinction between the business judgment rule, which insulates directors and management from personal liability for their business decisions, and the business judgment doctrine, which protects the decision itself from attack. The principles upon which the rule and doctrine operate are identical, while the objects of their protection are different. *See* Hinsey, *Business Judgment and the American Law Institute's Corporate Governance Project: The Rule, the Doctrine and the Reality*, 52 Geo. Wash. L.Rev. 609, 611–13 (1984). In the transactional justification cases, where the doctrine is said to apply, our decisions have not observed the distinction in such terminology. *See Polk v. Good & Texaco*, Del.Supr., —— A.2d ——, —— (1986); *Moran v. Household International, Inc.*, Del. Supr., 500 A.2d 1346, 1356 (1985); *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946, 953–55 (1985); *Rosenblatt v. Getty Oil Co.*, Del. Supr., 493 A.2d 929, 943 (1985). Under the circumstances we do not alter our earlier practice of referring only to the business judgment rule, although in transactional justification matters such reference may be understood to embrace the concept of the doctrine.

**11.** The relevant provision of Section 122 is:

Every corporation created under this chapter shall have power to:

(13) Make contracts, including contracts of guaranty and suretyship, incur liabilities, borrow money at such rates of interest as the corporation may determine, issue its notes, bonds and other obligations, and secure any of its obligations by mortgage, pledge or other encumbrance of all or any of its property, franchises and income, ...". 8 *Del.C.* § 122(13).

See Section 141(a) in n. 8, *supra.* See also Section 160(a), n. 13, *infra.*

debts incurred, and retain the profit for itself.[12] In adopting the Plan, the board protected the shareholders from a hostile takeover at a price below the company's intrinsic value, while retaining sufficient flexibility to address any proposal deemed to be in the stockholders' best interests.

To that extent the board acted in good faith and upon reasonable investigation. Under the circumstances it cannot be said that the Rights Plan as employed was unreasonable, considering the threat posed. Indeed, the Plan was a factor in causing Pantry Pride to raise its bids from a low of $42 to an eventual high of $58. At the time of its adoption the Rights Plan afforded a measure of protection consistent with the directors' fiduciary duty in facing a takeover threat perceived as detrimental to corporate interests. *Unocal*, 493 A.2d at 954–55. Far from being a "show-stopper," as the plaintiffs had contended in *Moran*, the measure spurred the bidding to new heights, a proper result of its implementation. *See Moran*, 500 A.2d at 1354, 1356–67.

■ Although we consider adoption of the Plan to have been valid under the circumstances, its continued usefulness was rendered moot by the directors' actions on October 3 and October 12. At the October 3 meeting the board redeemed the Rights conditioned upon consummation of a merger with Forstmann, but further acknowledged that they would also be redeemed to facilitate any more favorable offer. On October 12, the board unanimously passed a resolution redeeming the Rights in connection with any cash proposal of $57.25 or more per share. Because all the pertinent offers eventually equalled or surpassed that amount, the Rights clearly were no longer any impediment in the contest for Revlon. This mooted any question of their propriety under *Moran* or *Unocal.*

### C.

■ The second defensive measure adopted by Revlon to thwart a Pantry Pride takeover was the company's own exchange offer for 10 million of its shares. The directors' general broad powers to manage the business and affairs of the corporation are augmented by the specific authority conferred under 8 *Del.C.* § 160(a), permitting the company to deal in its own stock.[13] *Unocal*, 493 A.2d at 953–54; *Cheff v. Mathes*, 41 Del.Supr. 494, 199 A.2d 548, 554 (1964); *Kors v. Carey*, 39 Del.Ch. 47, 158 A.2d 136, 140 (1960). However, when exercising that power in an effort to forestall a hostile takeover, the board's actions are strictly held to the fiduciary standards outlined in *Unocal.* These standards require the directors to determine the best interests of the corporation and its stockholders, and impose an enhanced duty to abjure any action that is motivated by considerations other than a good faith concern for such interests. *Unocal*, 493 A.2d at 954–55; *see Bennett v. Propp*, 41 Del.Supr. 14, 187 A.2d 405, 409 (1962).

■ The Revlon directors concluded that Pantry Pride's $47.50 offer was grossly inadequate. In that regard the board acted in good faith, and on an informed basis, with reasonable grounds to believe that there existed a harmful threat to the corporate enterprise. The adoption of a defensive measure, reasonable in relation to the threat posed, was proper and fully accorded with the powers, duties, and responsibilities conferred upon directors under our law. *Unocal*, 493 A.2d at 954; *Pogostin v. Rice*, 480 A.2d at 627.

---

**12.** As we noted in *Moran*, a "bust-up" takeover generally refers to a situation in which one seeks to finance an acquisition by selling off pieces of the acquired company, presumably at a substantial profit. *See Moran*, 500 A.2d at 1349, n. 4.

**13.** The pertinent provision of this statute is:

(a) Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares. 8 *Del.C.* § 160(a).

### D.

■ However, when Pantry Pride increased its offer to $50 per share, and then to $53, it became apparent to all that the break-up of the company was inevitable. The Revlon board's authorization permitting management to negotiate a merger or buyout with a third party was a recognition that the company was for sale. The duty of the board had thus changed from the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit. This significantly altered the board's responsibilities under the *Unocal* standards. It no longer faced threats to corporate policy and effectiveness, or to the stockholders' interests, from a grossly inadequate bid. The whole question of defensive measures became moot. The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for the stockholders at a sale of the company.

### III.

This brings us to the lock-up with Forstmann and its emphasis on shoring up the sagging market value of the Notes in the face of threatened litigation by their holders. Such a focus was inconsistent with the changed concept of the directors' responsibilities at this stage of the developments. The impending waiver of the Notes covenants had caused the value of the Notes to fall, and the board was aware of the noteholders' ire as well as their subsequent threats of suit. The directors thus made support of the Notes an integral part of the company's dealings with Forstmann, even though their primary responsibility at this stage was to the equity owners.

■ The original threat posed by Pantry Pride—the break-up of the company—had become a reality which even the directors embraced. Selective dealing to fend off a hostile but determined bidder was no longer a proper objective. Instead, obtaining the highest price for the benefit of the stockholders should have been the central theme guiding director action. Thus, the Revlon board could not make the requisite showing of good faith by preferring the noteholders and ignoring its duty of loyalty to the shareholders. The rights of the former already were fixed by contract. *Wolfensohn v. Madison Fund, Inc.,* Del.Supr., 253 A.2d 72, 75 (1969); *Harff v. Kerkorian,* Del.Ch., 324 A.2d 215 (1974). The noteholders required no further protection, and when the Revlon board entered into an auction-ending lock-up agreement with Forstmann on the basis of impermissible considerations at the expense of the shareholders, the directors breached their primary duty of loyalty.

■ The Revlon board argued that it acted in good faith in protecting the noteholders because *Unocal* permits consideration of other corporate constituencies. Although such considerations may be permissible, there are fundamental limitations upon that prerogative. A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders. *Unocal,* 493 A.2d at 955. However, such concern for non-stockholder interests is inappropriate when an auction among active bidders is in progress, and the object no longer is to protect or maintain the corporate enterprise but to sell it to the highest bidder.

Revlon also contended that by *Gilbert v. El Paso Co.,* Del. Ch., 490 A.2d 1050, 1054–55 (1984), it had contractual and good faith obligations to consider the noteholders. However, any such duties are limited to the principle that one may not interfere with contractual relationships by improper actions. Here, the rights of the noteholders were fixed by agreement, and there is nothing of substance to suggest that any of those terms were violated. The Notes covenants specifically contemplated a waiver to permit sale of the company at a fair price. The Notes were accepted by the holders on that basis, including the risk of an adverse market effect stemming from a waiver. Thus, nothing remained for Rev-

lon to legitimately protect, and no rationally related benefit thereby accrued to the stockholders. Under such circumstances we must conclude that the merger agreement with Forstmann was unreasonable in relation to the threat posed.

A lock-up is not *per se* illegal under Delaware law. Its use has been approved in an earlier case. *Thompson v. Enstar Corp.*, Del. Ch., —— A.2d —— (1984). Such options can entice other bidders to enter a contest for control of the corporation, creating an auction for the company and maximizing shareholder profit. Current economic conditions in the takeover market are such that a "white knight" like Forstmann might only enter the bidding for the target company if it receives some form of compensation to cover the risks and costs involved. Note, *Corporations-Mergers— "Lock-up" Enjoined Under Section 14(e) of Securities Exchange Act—Mobil Corp. v. Marathon Oil Co., 669 F.2d 366 (6th Cir.1981)*, 12 Seton Hall L.Rev. 881, 892 (1982). However, while those lock-ups which draw bidders into the battle benefit shareholders, similar measures which end an active auction and foreclose further bidding operate to the shareholders' detriment. Note, *Lock-up Options: Toward a State Law Standard*, 96 Harv. L. Rev. 1068, 1081 (1983).[14]

Recently, the United States Court of Appeals for the Second Circuit invalidated a lock-up on fiduciary duty grounds similar to those here.[15] *Hanson Trust PLC, et al. v. ML SCM Acquisition Inc., et al.*, 781 F.2d 264 (2nd Cir.1986). Citing *Thompson v. Enstar Corp., supra*, with approval, the court stated:

In this regard, we are especially mindful that some lock-up options may be beneficial to the shareholders, such as those that induce a bidder to compete for control of a corporation, while others may be harmful, such as those that effectively preclude bidders from competing with the optionee bidder. 781 F.2d at 274.

In *Hanson Trust*, the bidder, Hanson, sought control of SCM by a hostile cash tender offer. SCM management joined with Merrill Lynch to propose a leveraged buy-out of the company at a higher price, and Hanson in turn increased its offer. Then, despite very little improvement in its subsequent bid, the management group sought a lock-up option to purchase SCM's two main assets at a substantial discount. The SCM directors granted the lock-up without adequate information as to the size of the discount or the effect the transaction would have on the company. Their action effectively ended a competitive bidding situation. The Hanson Court invalidated the lock-up because the directors failed to fully inform themselves about the value of a transaction in which management had a strong self-interest. "In short, the Board appears to have failed to ensure that negotiations for alternative bids were conducted by those whose only loyalty was to the shareholders." *Id.* at 277.

The Forstmann option had a similar destructive effect on the auction process. Forstmann had already been drawn into the contest on a preferred basis, so the result of the lock-up was not to foster bidding, but to destroy it. The board's stated reasons for approving the transactions were: (1) better financing, (2) note-

14. For further discussion of the benefits and detriments of lock-up options, also see: Nelson, *Mobil Corp. v. Marathon Oil Co.—The Decision and Its Implications for Future Tender Offers*, 7 Corp. L.Rev. 233, 265–68 (1984); Note, *Swallowing the Key to Lock-up Options: Mobil Corp. v. Marathon Oil Co.*, 14 U.Tol.L.Rev. 1055, 1081–83 (1983).

15. The federal courts generally have declined to enjoin lock-up options despite arguments that lock-ups constitute impermissible "manipu-

lative" conduct forbidden by Section 14(e) of the Williams Act [15 U.S.C. § 78n(e) ]. *See Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757 (2nd Cir.1983), *cert. denied*, 464 U.S. 1018, 104 S.Ct. 550, 78 L.Ed.2d 724 (1983); *Data Probe Acquisition Corp. v. Datatab, Inc.*, 722 F.2d 1 (2nd Cir.1983); *cert. denied* 465 U.S. 1052, 104 S.Ct. 1326, 79 L.Ed.2d 722 (1984); *but see Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir.1981). The cases are all federal in nature and were not decided on state law grounds.

holder protection, and (3) higher price. As the Court of Chancery found, and we agree, any distinctions between the rival bidders' methods of financing the proposal were nominal at best, and such a consideration has little or no significance in a cash offer for any and all shares. The principal object, contrary to the board's duty of care, appears to have been protection of the noteholders over the shareholders' interests.

While Forstmann's $57.25 offer was objectively higher than Pantry Pride's $56.25 bid, the margin of superiority is less when the Forstmann price is adjusted for the time value of money. In reality, the Revlon board ended the auction in return for very little actual improvement in the final bid. The principal benefit went to the directors, who avoided personal liability to a class of creditors to whom the board owed no further duty under the circumstances. Thus, when a board ends an intense bidding contest on an insubstantial basis, and where a significant by-product of that action is to protect the directors against a perceived threat of personal liability for consequences stemming from the adoption of previous defensive measures, the action cannot withstand the enhanced scrutiny which *Unocal* requires of director conduct. *See Unocal,* 493 A.2d at 954–55.

In addition to the lock-up option, the Court of Chancery enjoined the no-shop provision as part of the attempt to foreclose further bidding by Pantry Pride. *MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* 501 A.2d at 1251. The no-shop provision, like the lock-up option, while not *per se* illegal, is impermissible under the *Unocal* standards when a board's primary duty becomes that of an auctioneer responsible for selling the company to the highest bidder. The agreement to negotiate only with Forstmann ended rather than intensified the board's involvement in the bidding contest.

It is ironic that the parties even considered a no-shop agreement when Revlon had dealt preferentially, and almost exclusively, with Forstmann throughout the contest. After the directors authorized management to negotiate with other parties, Forstmann was given every negotiating advantage that Pantry Pride had been denied: cooperation from management, access to financial data, and the exclusive opportunity to present merger proposals directly to the board of directors. Favoritism for a white knight to the total exclusion of a hostile bidder might be justifiable when the latter's offer adversely affects shareholder interests, but when bidders make relatively similar offers, or dissolution of the company becomes inevitable, the directors cannot fulfill their enhanced *Unocal* duties by playing favorites with the contending factions. Market forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity.[16] Thus, as the trial court ruled, the shareholders' interests necessitated that the board remain free to negotiate in the fulfillment of that duty.

The court below similarly enjoined the payment of the cancellation fee, pending a resolution of the merits, because the fee was part of the overall plan to thwart Pantry Pride's efforts. We find no abuse of discretion in that ruling.

## IV.

Having concluded that Pantry Pride has shown a reasonable probability of success on the merits, we address the issue of irreparable harm. The Court of Chancery ruled that unless the lock-up and other aspects of the agreement were enjoined, Pantry Pride's opportunity to bid for Revlon was lost. The court also held that the need for both bidders to compete

---

16. *By this we do not embrace the "passivity" thesis rejected in Unocal. See 493 A.2d at 954–55, nn. 8–10. The directors' role remains an active one, changed only in the respect that they* are charged with the duty of selling the company at the highest price attainable for the stockholders' benefit.

in the marketplace outweighed any injury to Forstmann. Given the complexity of the proposed transaction between Revlon and Forstmann, the obstacles to Pantry Pride obtaining a meaningful legal remedy are immense. We are satisfied that the plaintiff has shown the need for an injunction to protect it from irreparable harm, which need outweighs any harm to the defendants.

## V.

In conclusion, the Revlon board was confronted with a situation not uncommon in the current wave of corporate takeovers. A hostile and determined bidder sought the company at a price the board was convinced was inadequate. The initial defensive tactics worked to the benefit of the shareholders, and thus the board was able to sustain its *Unocal* burdens in justifying those measures. However, in granting an asset option lock-up to Forstmann, we must conclude that under all the circumstances the directors allowed considerations other than the maximization of shareholder profit to affect their judgment, and followed a course that ended the auction for Revlon, absent court intervention, to the ultimate detriment of its shareholders. No such defensive measure can be sustained when it represents a breach of the directors' fundamental duty of care. *See Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 874 (1985). In that context the board's action is not entitled to the deference accorded it by the business judgment rule. The measures were properly enjoined. The decision of the Court of Chancery, therefore, is

AFFIRMED.