**DYNAMICS CORPORATION OF AMERICA, Plaintiff,**

v.

**WHX CORPORATION and SB Acquisition Corporation, Defendants.**

**No. 3:97 CV 702 (GLG).**

United States District Court, D. Connecticut.

June 17, 1997.

Day, Berry & Howard, by Thomas J. Groark, Jr., James Sicilian, Peter M. Holland, Hartford, CT, Skadden, Arps, Slate, Meagher & Flom, LLP, by Jay B. Kasner, Marco E. Schnabl, for Plaintiff.

Wiggin & Dana, by John F. Conway, Phyllis M. Pari, New Haven, CT, Olshan, Grundman, Frome & Rosenzweig, LLP, by Thomas J. Fleming, David E. Bamberger, New York City, for Defendants.

GOETTEL, District Judge.

## MEMORANDUM AND ORDER

This matter comes before the Court on defendants WHX Corporation and SB Acquisition Corporation's (collectively "WHX") motion for a preliminary injunction, seeking an order requiring plaintiff Dynamics Corporation of America ("DCA") to exempt the WHX tender offer from the DCA shareholder Rights Plan and from N.Y.B.C.L. § 912(b). These parties earlier appeared before this Court on a motion by DCA for a preliminary injunction, which was granted on April 29, 1997. For the reasons discussed below,

WHX's instant motion (document #54) is DENIED.

## FACTS

The undisputed facts are as follows. DCA is a New York corporation with its headquarters in Greenwich, Connecticut whose shares are listed on the New York Stock Exchange. DCA's principal asset is ownership of approximately 2.3 million shares of CTS common stock, representing approximately 44% of CTS's issued and outstanding shares. It is also a manufacturer of commercial and industrial products such as mixers and blenders sold under the "Waring" name. CTS is an Indiana-based manufacturer of electric components principally serving original equipment manufacturers in a variety of industries. WHX is a Delaware corporation with its principal executive offices in New York, New York.[1] WHX is a New York Stock Exchange listed company and is a domestic steel manufacturer.

In 1986, DCA adopted the DCA shareholder Rights Plan, under which the Rights become exercisable ten days after a person acquires beneficial ownership of 20% or more of DCA's common stock in a transaction not previously approved by DCA's Board of Directors. The Rights Plan provides that if a person buys 20% or more of DCA common stock and then merges with DCA, each Right would then entitle its holder to purchase for $80 securities in the acquiring company having a market value of $160. The Rights Plan thus reduces the proportionate share of stock held by the unapproved person by almost 50%.

On March 26, 1997, DCA issued a notice to its shareholders that the company's annual meeting would be held on May 2, 1997, during which shareholders would be given the opportunity to vote on four of DCA's seven directors who were then standing for re-election. These directors were to be elected to serve for a term of two years. At the time of the notice, DCA's Board was comprised of seven members, divided into two classes. Each class was elected to serve two-year terms, with four directors elected in 1995 to serve until the 1997 annual meeting.

The following day, on March 27, 1997, WHX commenced a hostile tender offer to acquire 649,000 shares (approximately 17%) of DCA's outstanding common stock at $40/share.[2] The tender offer stated that WHX's purpose was to acquire a significant equity interest in DCA as the first step in merger of WHX and DCA. The tender offer further disclosed WHX's intent to propose four nominees for election to the DCA Board of Directors at the annual meeting. The letter advised "If we do not hear from you by the close of business on Friday, March 28, we are authorized to present this proposal directly to your stockholders, through a proxy solicitation at the upcoming annual meeting and through a cash tender offer." On Monday, March 31, the tender offer was made public and the appropriate preliminary proxy materials were filed with the SEC.

The WHX tender offer was increased on April 9, 1997 to $45/share of DCA common stock. This offer unanimously was rejected by the DCA Board on April 11, 1997 after consulting with independent financial and legal consultants.[3]

During the April 11, 1997 meeting, the Board also implemented several changes to DCA's by-laws. The Board raised the threshold for a written request for special

---

**1.** Defendant SB Acquisition Corporation ("SB") is a wholly owned subsidiary of WHX Corporation formed for the purpose of the effecting the tender offer and merger at issue here. SB owns 109,861 shares of DCA common stock, approximately 2.9% of the 3.8 million outstanding shares.

**2.** WHX already owned something less than 3% of DCA stock. Thus, by acquiring only 17% of the outstanding shares, WHX would still be below the 20% mark and would not be subject to N.Y.B.C.L. § 912(b) or the shareholder Rights Plan. Section 912(b) establishes a five year prohi-

bition on any business combination between a corporation and a shareholder of 20% or more common stock, unless such combination is pre-approved by the corporation prior to the shareholder's acquisition of the stock. *See* N.Y.B.C.L. § 912(b). It has been considered a "poison pill" enhancing piece of legislation. *See* William D. Harrington, *Business Associations*, 42 Syracuse L.Rev. 299, 321 (1991).

**3.** Wasserstein Perella & Co, Inc. and Skadden, Arps, Slate, Meagher & Flom LLP, respectively.

meetings by shareholders from 25% to 66.6% of the issued and outstanding shares. The Board also amended the by-laws to remove the provision which allowed shareholders to remove directors without cause.

With respect the directors, the Board added two new members—Ronald Steiner and John Thompson—to its seven-person Board, raising the number to nine, and divided the new nine-person Board into three staggered classes of three directors each.[4] To conform with the staggered terms, the Board extended the tenures of Cohan, Gunther, and Lozyniak—whose terms were to expire in 1997—to 1998. As to Dorme, Knisel, and Sperber, who would be up for re-election in 1998, these Board members' terms were extended to 1999. Kensing, and the two new Board members—Steiner and Thompson—were to stand for re-election at the 1997 annual meeting. Finally, the Board cancelled its May 2, 1997 annual meeting and set a new meeting date for August 1, 1997.[5] The substance of these changes are the subject of a pending motion for partial summary judgment.[6]

DCA then commenced the present action against WHX, seeking a preliminary injunction requiring WHX to make further and complete disclosures in its tender offer and ordered that the tender offer period be extended twenty days. The SEC earlier had found that certain provisions of the tender offer materials were in violation of federal security laws, but these provisions had been eliminated. There remained, however, several conditional representations with respect to problems facing the offer inherent in N.Y.B.C.L. § 912 and the corporate plans. This Court granted DCA's preliminary injunction motion on April 29, 1997, finding that the conditional statements did not accurately disclose the obstacles the offer faced in achieving a merger. Consequently, WHX issued corrective disclosures and expanded its offer to include "any and all" of DCA's common shares at $45/share conditioned upon (1) redemption of DCA's shareholder "poison pill" Rights Plan and (2) waiver by DCA's Board of the restrictions contained in N.Y.B.C.L. § 912(b).

From April 5, 1997 to May 9, 1997, DCA and CTS engaged in negotiations regarding a possible business combination. On May 11, 1997, DCA announced that it had entered into a merger agreement with CTS. Pursuant to the terms of the merger agreement, CTS would commence a tender offer for up to 49.9% of the issued and outstanding shares of DCA common stock at $55/share (this offer was subsequently raised to $56.25/share).[7] To the extent that the tender offer was oversubscribed or shareholders choose not to accept the offer and the merger was nevertheless approved, DCA shareholders would receive .88 shares of CTS common stock for each DCA share. DCA further agreed to exempt CTS's share purchases from the DCA "poison pill" Rights Plan and to provide the requisite approval to exempt the transaction from N.Y.B.C.L. § 912(b) (see *supra* footnote 2). DCA also agreed to refrain from disabling the Rights Plan in

4. The original seven-person board consisted of: Harold Cohan, Frank Gunther, Andrew Lozyniak, Henry Kensing, Patrick Dorme, Russell Knisel, and Saul Sperber. Four of these are outside directors and three are corporate officers. The two new directors are the President of a subsidiary and another outside director.

5. In addition to the changes mentioned above, the Board approved amendments to the employment agreements of Lozyniak, Kensing, and Dorme to provide them with substantial benefits in the event of a "change of control". Change in control was defined to include the removal of a majority of the Board by lawful shareholder vote or the result of a successful merger. The Board also issued similarly worded golden parachute contracts to 30 employees and severance benefits to at least six other people.

6. There is also another summary judgment motion filed by WHX which seeks to have declared invalid a provision of the DCA Certificate of Incorporation which requires a vote of 80% or more of the stock if a beneficial owner of 5% or more of the stock seeks a merger or combination. WHX contends that this conflicts with N.Y.B.C.L. § 912(b) which applies only to holders of 20% or more of the target's stock.

7. The sale agreement also provided that DCA's three senior officers—Lozyniak, chairman and President; Dorme, Chief financial officer; and Kensing, General Counsel—were to receive ten year employment contracts with CTS after the sale. In addition, Lozyniak was to receive an option to purchase 100,000 shares of CTS stock at $62.50/share.

favor of a third party, provided that such action was not necessary to satisfy the Board's fiduciary obligations to its shareholders.[8] Upon the signing of the merger agreement, DCA paid CTS a non-refundable $2 million fee and committed to pay a $3 million break-up fee in the event that the merger was not consummated. CTS commenced its tender offer on May 16, 1997, to expire on June 13, 1997.

On May 27, 1997, WHX increased its offer to $56/share and extended its offer until June 13, 1997, to coincide with the expiration of the CTS offer. This offer remained contingent on DCA's redemption of the "poison pill" Rights Plan with respect to the offer and waiver of N.Y.B.C.L. § 912(b). WHX then filed this instant motion for a preliminary injunction on May 29, 1997, seeking to require DCA to exempt the WHX offer from the Rights Plan and from N.Y.B.C.L. § 912(b). After the filing of the motion, on June 2, 1997, CTS increased its cash tender offer from $56/share to $56.25/share. On June 4, the Board met again with its financial and legal advisors to consider the amended offers and ultimately reconfirmed its approval of the CTS transaction.

## DISCUSSION

WHX moves this Court for a preliminary injunction requiring DCA to redeem its "poison pill" Rights Plan with respect to the WHX offer and to approve the offer for purposes of N.Y.B.C.L. § 912(b). Essentially, WHX asks this Court to find that the DCA Board's decision to reject the WHX offer was not made in the best interests of the DCA shareholders and to bar the Board from using such defensive, anti-takeover devices.

In arguing its motion, WHX relies heavily on Delaware case law. As Judge Oakes noted in his concurring opinion in *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264.1 283 (2d Cir.1986), (which was decided before New York passed the "poison pill" legislation), Delaware law favors bidders more than even the pre-existing New York law. *Id.* at 285. Therefore, we are not convinced, particularly in light of the 1988 amendments to the New York statute, that Delaware cases should be controlling. However, even if they are controlling, they are distinguishable from the facts of this case.

In *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del.1986), relied upon heavily by WHX, the target board had given its favored suitor a lock-up agreement along with other related agreements which effectively precluded the competing bidder. The Delaware Supreme Court held that, although such lock-ups and related agreements were permitted under Delaware law, their adoption must be untainted by director interest and other breaches of fiduciary duty. *Id.* at 176. The Court then found that Revlon's agreement to negotiate with only one bidder violated the board's fiduciary duties, stating that the contending factions and "[m]arket forces must be allowed to operate freely to bring the target's shareholders the best price available for their equity." *Id.* at 184.

---

8. Section 5.2 of the DCA/CTS merger agreement provides, in relevant part:

> (a) The Company will not, nor will it permit any of its Subsidiaries to, nor will it authorize or permit any of its officers, directors or employees or any investment banker, financial advisor, attorney, accountant or other representative retained by it or any of its Subsidiaries to, directly or indirectly through another Person, (i) solicit, initiate or encourage (including by way of furnishing information), or take any other action designed to facilitate, any inquiries or the making or any proposal which constitutes any Company Takeover Proposal or (ii) participate in any discussions or negotiations regarding any Company Takeover Proposal; provided, however, that if, at any time prior to the Offer Completion Date, the Company Board determines in good faith, after consultation with its financial advisor and outside counsel, that failure to do so would create a reasonable possibility of a breach of its fiduciary duties to the Company's shareholders under applicable Law, the Company may, in response to a Company Takeover Proposal which was not solicited by it or which did not otherwise result from a breach of this Section 5.02(a), (A) furnish information with respect to the Company and each of its Subsidiaries to any Person pursuant to a customary confidentiality agreement (as determined by the Company after consultation with its outside counsel) and (B) participate in negotiations regarding such Company Takeover Proposal.

WHX also relies upon *Paramount Communications, Inc. v. QVC Network, Inc.*, 637 A.2d 34 (Del.1994). There, the Delaware Supreme Court upheld the traditional business judgment rule, stating that it would not second guess the reasonableness of a decision or substitute its own judgment for that of the board's if the decision was, on balance, within a range of reasonableness. *Id.* 45–46. The Court found, however, that the provision of a merger agreement in which the board had agreed not to solicit, encourage, discuss, or negotiate any competing transactions was unenforceable as being inconsistent with the directors' fiduciary duties. *Id.* at 49. The defensive provisions of the merger agreement granted the favored bidder the option to purchase a percentage of the seller's outstanding stock at a fixed price if the agreement was terminated for a competing transaction or if the shareholders did not approve of the merger. It also permitted the favored bidder to pay for shares with subordinated notes of questionable marketability and allowed the buyer to elect to require the seller to pay in cash a sum equal to the difference between the purchase price and the market price. The Court labeled these provisions as "draconian" and therefore clearly invalid. *Id.* at 49–51.

We have no similar provisions in this case. As noted above, the DCA Board remains free to negotiate with other bidders. *See supra* footnote 8. Indeed, at oral argument of this motion on June 12, 1997, DCA's counsel again stated that DCA would consider new and improved offers made by WHX. While there is a penalty if the existing agreement with CTS does not go through, it is not so large as to be considered "draconian".

 While there is no doubt that WHX would be on much stronger footing if Delaware's corporation law applied here, DCA is a New York corporation and as such the decisions of its Board must be reviewed under New York. corporation law standards. *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d at 273. Under New York corporation law, directors are obligated to a corporation and its shareholders by both a duty of loyalty and a duty of care in the

execution of directorial responsibilities. *Id.* at 273.

 Actions taken by board members are reviewed by a court using the business judgment rule. As described by the New York state courts, the business judgment rule bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgement in the lawful and legitimate furtherance of corporate purposes. *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d at 273, *citing, Auerbach v. Bennett*, 47 N.Y.2d 619, 629, 419 N.Y.S.2d 920, 926, 393 N.E.2d 994, 1000 (1979). While this doctrine does not give directors free rein to act as they would like, it does presuppose that, absence a prima facie showing to the contrary, a board's decisions were made on the basis of reasoned judgment and in the absence of self-dealing, conflict of interest, or bad faith. *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d at 287.

New York corporation law also expressly provides for the use of a "poison pill" provision like the one at issue here. Section 505(a)(2) permits a corporation to void or preclude the exercise of rights or options held by an interested person, a term defined in § 912 as a holder of 20% or more of the stock. N.Y.B.C.L. § 505(a)(2)(i). This exception was added to the anti-discrimination statute by the New York Legislature in December, 1988. In so doing, "the legislature effected a compromise between the general anti-discrimination norms embodied in Section 501 and the clearly expressed legislative concern about the proliferation of hostile takeovers." *Avon Products, Inc. v. Chartwell Associates, L.P.*, 738 F.Supp. 686, 689 (S.D.N.Y.), *aff'd*, 907 F.2d 322 (2d Cir.1990).

Section 505(a) (2)(ii) of this statute additionally provides that:

[d]eterminations of the board of directors whether to impose, enforce or waive or otherwise render ineffective such limitations or conditions as are permitted by [§ 505(a)(2)(i)] shall be subject to judicial review in an appropriate proceeding in which the courts formulate or apply appropriate standards in order to insure that such limitations or conditions are imposed,

enforced or waived in the best long-term interests and short-term interests of the corporation and its shareholders considering, without limitation, the prospects for potential growth, development, productivity and profitability of the corporation.

N.Y.B.C.L. § 505(a)(2)(ii). As such, the New York statute allows a board that is considering whether to redeem a "poison pill" Rights Plan to take into account the condition of the corporation, the effect of its decision on those shareholders who will not tender their stock, as well as maximization of the offer price.

We note that there is an absence of case law construing the business judgment rule standard since the 1988 "poison pill" amendment to the New York corporation laws took effect. We are fortunate in that regard to have a very recent decision from the New York Supreme Court (the basic trial court of general jurisdiction in New York state) involving similar issues and concerning the same tender offer that forms the basis of this present suit. In *Steiner v. Losyniak et al.,* Index No. 601661/97, slip op. (N.Y.App.Div. June 11, 1997), J. Charles Edward Ramos denied a DCA shareholder's motion for a preliminary injunction requesting the same relief sought here by WHX. In so holding, the court stated:

> ... actions taken by New York corporations' boards of directors are governed by the "business judgment doctrine." *Auerbach v. Bennett,* 47 N.Y.2d 619, 629–31, 419 N.Y.S.2d 920, 393 N.E.2d 994 (1979). "That doctrine bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes." *Auerbach,* 47 N.Y.2d at 629, 419 N.Y.S.2d 920, 393 N.E.2d 994; *see also Lindner Fund v. Waldbaum, Inc.,* 82 N.Y.2d 219, 224, 604 N.Y.S.2d 32, 624 N.E.2d 160 (1993) (holding that "absent allegations or a showing of some countervailing misconduct or manipulation," board decisions are protected from judicial inquiry by the business judgment doctrine).
>
> [The DCA Board's] action to amend its Rights Plan and to apply N.Y.B.C.L. § 912(b) in favor of CTS and not in favor

of WHX was on the face reasonable and passes scrutiny under N.Y.B.C.L. § 505. CTS' cash offer exceeds WHX's tender offer, and, at current stock prices, the CTS/DCA stock swap also offers DCA shareholders more than the $56 offered by WHX. Furthermore, as of June 6, 1997, the price of DCA stock closed at $57.50 on the New York Stock Exchange. As such, the DCA board is not obligated to redeem the Rights Plan in favor of the WHX proposal.

*Steiner v. Losyniak et al.,* Index No. 601661/97, slip op. at 5–6 (N.Y.App.Div. June 11, 1997).

 To obtain the desired relief, WHX must show: (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them fair grounds for litigation, plus a balance of the hardships tipping decidedly toward the party requesting the preliminary relief. *ICN Pharmaceuticals, Inc. v. Khan,* 2 F.3d 484, 490 (2d Cir.1993); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979). In a takeover context, a preliminary injunction is an extraordinary and drastic remedy which should not be routinely granted. *Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d at 273.

 WHX strenuously argues that the DCA Board breached a fiduciary duty to its shareholders by engaging in defensive anti-takeover tactics and rejecting WHX's tender offer. However, it has not presented any evidence to support this argument. WHX claims that its "any and all" cash offer of $56/share is superior to what it describes as CTS's coercive, two-tiered, front-loaded offer. On the face of the offers, however, the current DCA cash offer is superior to WHX's offer by .25/share. With respect to the shares of CTS stock which will be distributed on a pro rata basis in the event that the tender offer is oversubscribed, all of the evidence presented at the June 12, 1997 hearing leads this Court to conclude that the value of the combined consideration of cash and CTS stock still exceeds the WHX offer. As Wasserstein Perella, DCA's financial advisor, noted at its meeting with the DCA Board on

June 4, 1997 (after CTS had increased its cash price offer from $55/share to $56.25), the merger will favorably impact on CTS's common stock market prices by eliminating the DCA ownership of 44% of CTS's stock, resulting in a larger public float that should enhance the liquidity of the stock. Moreover, Wasserstein Perella also noted that CTS had been doing quite well recently and anticipated that the merger would give an opportunity for synergies and cost savings. All of this indicates that the current market value of CTS is not likely to decline and may actually increase following the merger.

The merger aspects of this offer following tender also are clearly more desirable to the corporation and its shareholders than a takeover by WHX. At present time, holders of DCA stock have a substantial interest in CTS, as DCA's largest asset is a 44% stake in CTS, the market value of which totalled $86 million at December 31, 1995 and has risen to $157.8 million today. As a result of the merger, DCA shareholders will own stock in CTS directly and will, in effect, be receiving back their indirect interests in the company. It is more desirable to be a direct shareholder than an indirect shareholder. Moreover, while there will be adverse tax consequences for most of those shareholders receiving cash as part of the tender offer, to the extent that stock is received as part of the tender, or by virtue of not participating in the tender, it appears to be a tax–free exchange. Thus, in both the short– and long–term, the WHX offer continues to be inferior to the CTS offer.

In addition, there is nothing to suggest that the DCA Board breached its fiduciary duty in the manner in which it reached its decisions. Each of the Board's decisions was made deliberately, after extensive discussion and consideration of the advice of its financial and legal advisors and consideration of a range of alternative strategies. As such, the "the directors made an informed decision, having availed themselves of the advice of experts and using the available time to consider their options carefully," and therefore met the primary requirement of the duty of due care. *British Printing & Communication Corp. PLC v. Harcourt Brace Jovano-*

*vich, Inc.,* 664 F.Supp. 1519, 1530 (S.D.N.Y. 1987).

Furthermore, at the time that DCA entered into the merger agreement with WHX, the WHX offer—at $45/share—was significantly less attractive. While WHX has since raised its offer to $56/share, we must evaluate the validity of the Board's decision at that time in light of the circumstances that existed and were known to the directors when the agreement with CTS was entered into. *Hastings–Murtagh v. Texas Air Corp.,* 649 F.Supp. 479, 485 (S.D.Fla.1986). Since the WHX offer was, at that time, $10/share less than that being offered by CTS, we cannot say that the Board's decision to accept the CTS offer was unreasonable. In fact, as DCA has argued, and as appears likely, the improvement of WHX's offer was a direct result of DCA's agreement with CTS. *See Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d at 274 (granting of benefits to a "white knight" may be effective means of raising bidding price); *Samjens Partners I v. Burlington Industries, Inc.,* 663 F.Supp. 614, 624 (S.D.N.Y.1987) (directors may maximize company's value at sale by granting benefits to bidder)

Moreover, unlike the agreement in *Paramount Communications, Inc. v. QVC Network, Inc.,* 637 A.2d 34 (Del.1994), the DCA/CTS agreement contains a "fiduciary-out" provision whereby DCA is permitted to engage in negotiations with other bidders when such action is necessary to meet the directors' fiduciary obligations. Nothing in the evidence presented by WHX would lead us to conclude that the Board erroneously failed to exercise this right. As stated earlier, the Board's conclusion that the CTS offer is superior to the WHX offer in many respects appears to be quite reasonable. Certainly, it is within the reasonable bounds of the business judgment rule and we will not disturb it.

Finally, issuing the requested relief at this stage would have detrimental consequences for DCA. The DCA/CTS merger contains a provision whereby CTS is permitted to withdraw its tender offer in the event that DCA redeems the Rights Plan and waives § 912(b) for another bidder. In the event that CTS does do so, DCA would be required to pay a

termination fee of $3 million and forfeit the $2 million sign–on fee. Moreover, such relief would impair the contractual rights of CTS and DCA, who entered into a legally binding agreement only after determining that doing so would be in the best short– and long–term interests of its shareholders and the corporation.

Applying the preliminary judgment standards of the Second Circuit to the facts before us now, we find that WHX has not made its requisite showing of a reasonable probability of success on the merits, and we further find that the burden of hardships is actually greater to DCA. Accordingly, WHX's motion for a preliminary injunction (document # 54) is DENIED.