# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE ORACLE CORPORATION
DERIVATIVE LITIGATION

)  CONSOLIDATED
)  C.A. No. 2017-0337-SG

## MEMORANDUM OPINION

Date Submitted: March 11, 2020
Date Decided: June 22, 2020

Joel Friedlander, Jeffrey M. Gorris, Christopher P. Quinn, and Bradley P. Lehman, of FRIEDLANDER & GORRIS, P.A., Wilmington, Delaware; OF COUNSEL: Randall J. Baron and David A. Knotts, of ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, of ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Brian J. Robbins, Stephen J. Oddo, and Gregory Del Gaizo, of ROBBINS LLP, San Diego, California, *Attorneys for Lead Plaintiff Firemen's Retirement System of St. Louis*.

Elena C. Norman and Richard J. Thomas, of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; OF COUNSEL: Peter A. Wald, of LATHAM & WATKINS LLP, San Francisco, California; Blair Connelly, of LATHAM & WATKINS LLP, New York, New York, *Attorneys for Defendants Lawrence J. Ellison and Safra A. Catz.*

Kenneth J. Nachbar, John P. DiTomo, and Thomas P. Will, of MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; OF COUNSEL: Sara B. Brody and Jaime A. Bartlett, of SIDLEY AUSTIN LLP, San Francisco, California; Matthew J. Dolan, of SIDLEY AUSTIN LLP, Palo Alto, California, *Attorneys for Defendants Jeffrey O. Henley, Renée J. James, and Paula R. Hurd as Trustee of the Hurd Family Trust*.

A. Thompson Bayliss and E. Wade Houston, of ABRAMS & BAYLISS LLP, Wilmington, Delaware; OF COUNSEL: John W. Spiegel, George M. Garvey, and John M. Gildersleeve, of MUNGER, TOLLES & OLSON LLP, Los Angeles, California, *Attorneys for Defendant Evan Goldberg*.

Andrew S. Dupre and Sarah E. Delia, of MCCARTER & ENGLISH, LLP, Wilmington, Delaware; OF COUNSEL: Robert P. Feldman, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, Redwood Shores, California; Christopher D.

Kercher, of QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York, *Attorneys for Defendant Zachary Nelson.*

Thomas A. Beck, Blake Rohrbacher, Susan M. Hannigan, Matthew D. Perri, and Daniel E. Kaprow, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, *Attorneys for Nominal Defendant Oracle Corporation.*

GLASSCOCK, Vice Chancellor

This matter was brought by stockholders of a major technology company, Oracle Corporation ("Oracle"). They allege that breaches of fiduciary duty inhere in Oracle's overpriced acquisition of a second technology company, NetSuite, Inc. ("NetSuite"). The fiduciary duty claims against Oracle fiduciaries Ellison and Catz have withstood a motion to dismiss.[1]

Among the other Defendants are both the Chief Executive Officer and the Chairman of the Board of the *acquired* company, NetSuite. Plaintiffs allege that these NetSuite fiduciaries tortiously aided and abetted breaches of duty by Oracle fiduciaries. This Memorandum Opinion resolves these two Defendants' Motions to Dismiss.

Can a fiduciary for an acquired entity aid and abet breaches of duty by a fiduciary for the buyer? Brief reflection reveals that, in the infinite garden of theoretical inequity, such a flower may bloom. But what if the breach of duty relates *only* to the buyer paying the seller too much? In such a case, the cogitation quotient must increase, in light of the fact that the seller's fiduciaries have a duty to their own stockholders to *maximize* price.[2] At Oral Argument, Lead Plaintiff's counsel offered this memorable hypothetical (moderately enhanced here to make the implicit, explicit):

---

[1] *In re Oracle Corp. Derivative Litig.*, 2018 WL 1381331 (Del. Ch. Mar. 19, 2018).
[2] *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986).

Posit two technology companies, both founded by the same rapacious genius ("RG"). Co. A is a giant; Co. B is smaller, and does not initially compete in Co. A's space. As Co. A grows, however, it begins to compete with Co. B; insiders at both companies (but not the trading public) are aware that ultimately Co. A will outcompete and destroy Co. B.

RG is a large blockholder of Co. B. Along with his minion, the CEO of Co. A ("Minion"), he develops a scheme to transfer Co. A's wealth to himself through the overpriced acquisition of Co. B. Minion meets with one of two pliable fiduciaries of Co. B. She informally suggests a purchase of Co. B at $100/share, which both Minion and the pliable fiduciary know to be a gross overvaluation. The pliable fiduciary responds with an even grosser proposal of $125. Thus, a price collar is set.

Thereafter, a secret dinner is held, attended by RG and the other pliable Co. B fiduciary. The following facts and aspects of the scheme are made explicit at the dinner:

Co. B will be destroyed by competition with Co. A, although this fact is not yet reflected in Co. B's trading price.

It is in Co. A's business interest to simply proceed *without* acquiring Co. B.

The inevitable destruction of Co. B means that Co. B's pliable fiduciaries will lose their jobs, and their stock in Co. B will decline in value.

2

It is in RG's financial interest as a blockholder of Co. B. that Co. A buy Co. B at an excessive price, within the price collar. He shares that interest with the other stockholders of Co. B—including the pliable fiduciaries. In addition, the pliable fiduciaries have an interest not shared with the other Co. B stockholders; RG and Minion promise them perpetual employment via Co. A, if Co. B is acquired by Co. A. Additionally, it is implied that Minion will be rewarded by RG upon Co. A's acquisition of Co. B.

Thus, in the overpriced purchase of Co. B by Co. A, everyone wins except Co. A and its stockholders, who will be impoverished.

RG and Minion convey to the pliable Co. B fiduciaries that Minion can make the deal happen. She will use her influence over Co. A's board to set up a sham special committee of loyal but gullible directors of Co. A, then use her powers of persuasion and obfuscation to steer the special committee to a purchase within the price collar. She will also ensure that the scheme is concealed from the stockholders and loyal fiduciaries of Co. A.

However, RG and Minion inform the pliable fiduciaries of Co. B that *they* have an important role to play in the scheme as well, requiring the pliable fiduciaries to commit a corrupt act. The pliable fiduciaries must ensure that the scheme, including the perpetual employment agreement and price collar, is not disclosed to the *Co. B stockholders* who will be asked to approve the sale. This concealment will

require that the pliable fiduciaries ensure that Co. B issue misleading disclosures to its stockholders. This will be in breach of the duty of candor owed by the pliable fiduciaries to their stockholders, but no damages will result; Co. B stockholders are in fact incidental beneficiaries of the scheme. The deception is necessary to the scheme, however, for the following reason: if the scheme becomes public, it will likely become known by the special committee of loyal but gullible directors of Co. A. The scales will fall from these committee members' eyes; gullible no more, they will realize that Co. A is being fleeced, and nix the deal.

The scheme is agreed to; Minion does her part; the pliable fiduciaries of Co. B actively conceal the scheme from the public by omitting the pertinent details from Co. B's securities filings, and the merger is consummated to the detriment of Co. A and its stockholders.

A complaint based on this hypothetical against the pliable fiduciaries, alleging aiding and abetting of RG's and Minion's breaches of duty, composed of well-pled allegations sufficient to permit me to plausibly infer all the forgoing facts, would withstand a motion to dismiss.

As Plaintiffs' counsel conceded, however, his hypothetical does not reflect the real-world Third Amended Complaint ("TAC"), the operative pleading here. The TAC is but a faint shadow of the robust hypothetical. In the TAC, the part of the rapacious genius is filled by Defendant Lawrence J. Ellison; the Minion by

4

Defendant Safra A. Catz; the pliable fiduciaries by Defendants Evan Goldberg and Zachary Nelson of NetSuite; with Oracle as Co. A and NetSuite as Co. B. The TAC alleges only that the price collar discussion between Katz and Nelson took place, and that Ellison discussed with Goldberg that NetSuite would remain as an independent entity post-acquisition, presumably implying continued employment for Goldberg and Nelson. The TAC also reveals that NetSuite *disclosed the foregoing information to its stockholders.* The TAC alleges that these disclosures in NetSuite's Schedule 14D-9 were inadequate in two respects: the full context (*i.e.* date and substance) of the discussion of the preservation of NetSuite, post-acquisition, was omitted; and the supplemental nature of the disclosure of the price collar discussion made that disclosure inadequate.

Even if I could reasonably infer that these alleged disclosure deficiencies were the result of a scheme akin to the one described in the hypothetical—that is, even if I found the rather florid hypothesization above was reasonably implied by the facts pled—it is not reasonably conceivable that the disclosure deficiencies just described represent substantial assistance to Ellison's and Catz's alleged breach of fiduciary duty. That is, it is *not* the case that the intention of Oracle to keep NetSuite as an independent subsidiary was concealed in NetSuite's public filings. It is *not* the case that the "price collar" discussion was concealed—it was initially omitted but disclosed in filings and by a supplemental proxy. In other words, it is the *form* of

5

those disclosures that is relied on by the Lead Plaintiff to constitute substantial assistance by Nelson and Goldberg to the Ellison and Katz scheme. The Plaintiffs theory appears to be that if the date of the first discussion of the preservation of post-acquisition NetSuite had only been disclosed, or if the disclosure of the price collar had only been packaged differently, Oracle's special committee would have been alerted to the fact that the acquisition was not in Oracle's interest, and withdrawn from the acquisition. I find that inference unreasonable. In fact, it is unreasonable to conclude that the NetSuite disclosure deficiencies alleged, compared to "perfect" disclosures, assisted Ellison and Katz' scheme, at all. Since not only knowledge and scienter, but also substantial assistance, are elements of the aiding and abetting tort, the Motions to Dismiss must be granted, and I need not examine whether the Lead Plaintiff has successfully alleged the other elements of the claim. A more detailed look at the facts, and my reasoning, is below.

## I. BACKGROUND[3]

### A. The Parties and Relevant Non-Parties

Nominal Defendant Oracle is a Delaware corporation headquartered in Redwood City, California.[4] Oracle is a technology company that offers an integrated

---

[3] The facts, except where otherwise noted, are drawn from the Lead Plaintiff's Verified Third Amended Derivative Complaint, D.I. 315 (the "Third Amended Complaint" or "TAC"), and are presumed true for the purposes of evaluating the Defendants' Motions to Dismiss.

[4] TAC, ¶ 21.

array of applications, servers, storage, and cloud technologies.[5]  Oracle has over 135,000 full-time employees, over 420,000 customers across 175 countries, and its market capitalization exceeds $200 billion.[6]

Non-party NetSuite was founded in 1998 and provided cloud-based financial management and enterprise resource planning ("ERP") software suites for medium sized businesses.[7]  On November 5, 2016, NetSuite was acquired by Oracle for $109 per share (the "Acquisition").[8]

Defendant Lawrence J. Ellison founded Oracle in 1977 and served as Oracle's Chief Executive Officer until September 2014, at which time he became Chairman of the Board and Chief Technology Officer.[9]  Ellison also co-founded NetSuite in 1998.[10]  Ellison and his affiliates beneficially owned an aggregate of approximately 44.8% of NetSuite's common stock prior to the Acquisition.[11]

Defendant Safra A. Catz has been Oracle's Chief Executive Officer since September 2014 and has held other various positions with Oracle since 1999.[12]

---

[5] *Id.*
[6] *Id.*
[7] *Id.* ¶¶ 52, 59.
[8] *Id.* ¶¶ 157, 181.
[9] *Id.* ¶ 23.
[10] *Id.* ¶ 52.
[11] *Id.* ¶ 23.
[12] *Id.* ¶ 24.

Defendant Evan Goldberg co-founded NetSuite with Ellison in 1998 after working at Oracle for eight years.[13] Goldberg was Chief Technology Officer and Chairman of the Board of NetSuite.[14] Upon consummation of the Acquisition Goldberg was named Executive Vice President, Oracle NetSuite Global Business Unit, with responsibility for product strategy and development.[15]

Defendant Zachary Nelson was the Chief Executive Officer of NetSuite.[16] Before joining NetSuite, Nelson worked at Oracle, where he was Oracle's longest-serving Vice President for Marketing.[17]

Defendant Paula R. Hurd as Trustee of the Hurd Family Trust is the legal successor to Mark V. Hurd, who was Oracle's Chief Executive Officer from September 2014 until his death in October 2019.[18] Hurd was Oracle's President from September 2010 to September 2014.[19]

Defendant Jeffrey O. Henley has been Oracle's Executive Vice Chairman of the Board since September 2014.[20] Henley was Oracle's Chairman of the Board

---

[13] *Id.* ¶ 28.
[14] *Id.*
[15] *Id.*
[16] *Id.* ¶ 29.
[17] *Id.*
[18] *Id.* ¶ 25.
[19] *Id.*
[20] *Id.* ¶ 26.

from January 2004 to September 2014 and Oracle's Executive Vice President and Chief Financial Officer from March 1991 to July 2004.[21]

Defendant Renée J. James is a director of Oracle, a position she has held since December 2015.[22] James was the chair of the special committee of Oracle's Board empowered with respect to the Acquisition.[23]

Lead Plaintiff Firemen's Retirement System of St. Louis (the "Lead Plaintiff") was a stockholder of Oracle at the time of the conduct described in the TAC and has continuously held Oracle stock since that time.[24]

*B. Increasing Competition Between Oracle and NetSuite; NetSuite Identified as an Acquisition Target*

NetSuite was founded in 1998 by Ellison and Goldberg to provide companies with business management software over the internet.[25] Ellison, through an affiliated entity, provided the financial backing to start NetSuite and the TAC alleges that Ellison was NetSuite's controlling stockholder.[26] Ellison long viewed NetSuite as his company and long planned for Oracle to acquire it—when Ellison's biographer asked Ellison what would happen if Microsoft made an offer for NetSuite, Ellison responded: "I'd tell them to get [expletive]. I suppose [Goldberg]

---

[21] *Id.*
[22] *Id.* ¶ 27
[23] *Id.* ¶ 110.
[24] *Id.* ¶ 20.
[25] *Id.* ¶ 52.
[26] *Id.*

might take a swing at me, but I own 55 percent of the company, and there's no way in hell Microsoft's going to get it."[27]  NetSuite was publicly offered in December 2007 at a valuation of approximately $1.5 billion (the "IPO"), with Ellison and his affiliates owning approximately 65% of NetSuite's common stock.[28]

After NetSuite's IPO, NetSuite experienced rapid growth, expanding annual revenues from $108 million in 2007 to $741 million in 2015.[29]  Important to NetSuite's growth was that it provided cloud-based financial management and ERP software suites for medium-sized businesses without meaningful competition from large ERP software providers.[30]  But by 2015, the large ERP software providers— including Oracle—began to aggressively target the small and mid-sized businesses that were NetSuite's core customers.[31]

Oracle was particularly focused on outcompeting NetSuite, and Henley wanted to ensure Oracle was communicating the message that Oracle believed that the mid-market would be Oracle's biggest market-share gain in future years.[32] Simultaneously, Ellison and Catz began exploring buying NetSuite, and Ellison wanted to receive premium value for his controlling stake in NetSuite before the market realized the negative impact to NetSuite from pressure from the larger ERP

[27] *Id.* ¶ 53.
[28] *Id.* ¶ 54.
[29] *Id.*
[30] *Id.* ¶ 59.
[31] *Id.*
[32] *Id.* ¶¶ 60–61.

10

providers.[33]   On February 20, 2015, Ellison wrote Catz: "We need to discuss NetSuite" and later that day, Ellison, Goldberg, and Nelson held a conference call.[34] By February 25, 2015, a presentation book was prepared for Ellison, Catz, and Hurd about a potential acquisition of NetSuite by Oracle, with a baseline assumption that Oracle would pay $120 per share of NetSuite, an 18.9% premium from NetSuite's then-price of $100.91 per share.[35]

Internal Oracle presentations from around this time period reflected the increasing competition between Oracle and NetSuite. For instance, a presentation to the Board's Committee on Independence Issues (the "Independence Committee")—which was charged with approving software subscription and licensing support agreements between Oracle and NetSuite because they were "Related Party Transactions"—noted that Oracle and NetSuite competed for $23.6 million of opportunities in fiscal year 2014 and $39.1 million of opportunities in 2015 compared to $16.7 million of opportunities cumulatively from fiscal years 2007 to 2013.[36]   The same presentation noted that Ellison's "potential conflicts of interest . . . could prevent potential acquirers such as SAP or Microsoft from making a bid for NetSuite even if it is in the best interest of [NetSuite] shareholders."[37]   A

---

[33] *Id.* ¶ 60.
[34] *Id.* ¶ 62.
[35] *Id.*
[36] *Id.* ¶ 64.
[37] *Id.*

2015 Oracle internal management presentation provided advice on how to compete with NetSuite in winning new customers and identified 11 reasons why Oracle wins in head-to-head competition and 8 reasons why NetSuite wins.[38]

NetSuite likewise recognized the increasing competition between itself and Oracle. A December 2015 NetSuite senior management presentation identified Oracle as a competitor—shortly after that presentation Nelson emailed Ellison stating: "You know we are 24X as large as you in Cloud ERP ;)" Ellison responded that Oracle had "about 2,000 cloud ERP customers."[39] Nelson responded to Ellison that NetSuite had "about 13000 (live) individual ERP companies."[40] NetSuite's stock price fell from $107.31 per share on January 2, 2015 to $53.11 per share on February 12, 2016.[41]

Industry analysts commented on competition between Oracle and NetSuite. In June 2016, Cowen and Company opined that Oracle was the "biggest near-term competitive threat" to NetSuite in part because Oracle had "move[d] down into the mid-market where it historically did not compete."[42] Stifel Nicholaus & Company noted in July 2016 that "checks continue to suggest Oracle is having increasing

---

[38] *Id.* ¶ 66.
[39] *Id.* ¶ 69.
[40] *Id.*
[41] *Id.* ¶ 70.
[42] *Id.* ¶ 71.

success in cloud ERP in the mid-market and Microsoft is making a more aggressive push[.]"[43]

Against this backdrop, Ellison decided that Oracle should acquire NetSuite.[44] At a two-day in-person Board meeting on January 14–15, 2016 attended by all then-directors of Oracle, Catz led a strategy discussed with the Board, during which the Board was given a verbal overview of a potential acquisition of NetSuite, which had been code-named "Napa."[45] Ellison sat in on the management proposal and the subsequent Board discussion even though Oracle's Independence Committee had responsibility to review and approve related party transactions, such as a potential acquisition of NetSuite.[46] The proposal focused solely on the possibility of acquiring NetSuite, with no discussion of alternatives—additionally, management did not provide the Board with written materials regarding the potential NetSuite acquisition.[47] After the discussion, Oracle's Board "directed management to continue to assess the feasibility of pursuing Project Napa" and directed Catz and Hurd "to understand if NetSuite would be willing to receive an indication of interest but to not engage in any price discussions or otherwise engage with NetSuite's management."[48]

---

[43] *Id.* ¶ 72.
[44] *Id.* ¶ 76.
[45] *Id.*
[46] *Id.* ¶ 77.
[47] *Id.*
[48] *Id.* (internal quotation marks omitted).

13

*C. Communications Between Oracle and NetSuite Fiduciaries*

On January 15, 2016, Catz asked Nelson (then NetSuite's CEO) if he was available for dinner; the two dined on January 19, 2016 and spoke again shortly after.[49] Twice thereafter Nelson summarized his discussions with Catz. Notes from a January 25, 2016 NetSuite Board meeting state: "Z at $120. S more at $100."[50] Months later, Nelson told the story of his conversation with Catz to investment professionals at T. Rowe Price, a large blockholder of NetSuite stock. A T. Rowe Price representative memorialized Nelson's telling: "Safra's $100 bid (off the cuff according to N). Zack's $125 bid (off the cuff according to N)," and "a loose, pre-due-diligence exploratory conversation where a price range of $100–125 was discussed."[51] Deposition testimony regarding the conversation states: "[Nelson] didn't specifically say, Safra said this. It was more like, Safra, you know, mentioned 100; I went back with 125[,]" and "[Nelson said Catz] almost made the statement 'It's time,' you know, as, like, it was an inevitability that now you have to come, so to speak."[52]

Six days after Catz and Nelson's conversation, Goldberg (then NetSuite's Chief Technology Officer and Chairman of the Board) arranged a principal-to-

---

[49] *Id.* ¶ 79.
[50] *Id.* ¶ 81. Nelson's first name is Zachary and Catz's first name is Safra.
[51] *Id.* ¶ 82.
[52] *Id.* ¶ 83.

principal conversation between himself and Ellison.[53]  Per the TAC, during that conversation, Goldberg "secured an undisclosed understanding from Ellison about how an acquisition would work."[54]  Part of this understanding was that Ellison promised not to harm NetSuite in the acquisition process and to keep the NetSuite business intact post-closing.[55]  Goldberg recounts: "There was a commitment at [sic] highest level of Oracle—Mark Hurd, Safra Catz and Larry Ellison—to maintain the integrity of the Netsuite organization.  We became what's called a global business unit."[56]

By February 2 or 3, 2016, each of Ellison, Catz, Nelson, and Goldberg had agreed in principle on a friendly cash acquisition of NetSuite by Oracle within a price range of $100 to $125.[57]  On February 3, 2016, Goldberg proposed to Ellison that Ellison have dinner with Goldberg and Goldberg's wife upon the signing of the Acquisition agreement, writing: "This is a huge life event for Cindy and me— NetSuite is a huge part of both of our lives.  At some point, probably after an agreement is inked (assuming it is) we'd love to have dinner with you to talk about it, just from a personal angle."[58]

---

[53] *Id.* ¶ 92.
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.* ¶ 95.
[58] *Id.* ¶ 94.

*D. The Special Committee is Constituted; Initial Negotiations*

Oracle's Board held a special meeting about NetSuite on March 18, 2016; Ellison, Henley, and Hurd absented themselves from the Board meeting.[59] At the meeting, Catz reported back to the Board on her discussion with Nelson; the Board minutes read:

> Ms. Catz stated that following the January board meeting, as directed by the Board, she had reached out to a senior representative of NetSuite to gauge whether NetSuite would be willing to consider a potential offer from the Corporation. Ms. Catz stated that the NetSuite representative had indicated that the NetSuite board would be willing to consider an offer from the Corporation. Ms. Catz informed the Board that no other terms or details relating to any potential transaction with NetSuite were discussed.[60]

Notably, the Board minutes do not reflect that Catz and Nelson discussed a price collar of $100 to $125.

Oracle's Board appointed directors James, Leon Panetta, and George Conrades as members of a special committee empowered with respect to the Acquisition (the "Special Committee").[61] None of the three Special Committee members were members of the Independence Committee.[62] Oracle's Board resolutions delegated the full and exclusive power of the Board and the Independence Committee to the Special Committee with regard to the potential

---

[59] *Id.* ¶ 103.
[60] *Id.* ¶ 104.
[61] *Id.* ¶ 105.
[62] *Id.*

16

NetSuite acquisition, including the express power to make the required determinations under the Independence Committee charter and Oracle's conflict of interest policy.[63] The Special Committee was also given responsibility for directing senior management's involvement in assessing a potential transaction.[64] The only identified power of the Special Committee with respect to potential alternatives—that is, other than the NetSuite acquisition—was to "evaluate" them.[65]

The Special Committee held its first meeting on April 8, 2016—management's presentation materials for that meeting stated that Oracle and NetSuite each bring "complementary strengths in the business applications industry" with no mention of head-to-head competition between the two companies.[66] Defendant James was appointed as chair of the Special Committee.[67] Additionally, the Special Committee retained Moelis & Company LLC ("Moelis") as its financial advisor.[68]

The TAC alleges that James "operated in complete sync with Catz and allowed Catz to lead the acquisition of NetSuite."[69] Catz presented at 10 of the 13

---

[63] *Id.* ¶ 106.
[64] *Id.*
[65] *Id.*
[66] *Id.* ¶ 109.
[67] *Id.* ¶ 110.
[68] *Id.* ¶ 114.
[69] *Id.* ¶ 113.

Special Committee meetings, and the TAC alleges that the Special Committee followed each recommendation made by Catz and Oracle's management team.[70]

On May 20, 2016, the Special Committee met to decide whether to pursue an acquisition of NetSuite.[71] The Special Committee heard presentations from Oracle's management and Moelis—both presentations concluded that NetSuite was preferable to other acquisition targets.[72] Management's presentation advocated that NetSuite was the "best strategic fit," and the Special Committee determined that it would focus on an acquisition of NetSuite.[73] On May 26, 2016, Ellison was instructed not to communicate with Catz or other Oracle personnel about the acquisition.[74]

On May 27, 2016, the Special Committee met once again to consider the potential NetSuite acquisition.[75] Moelis presented its preliminary financial analysis of NetSuite, which included a Selected Public SaaS Companies analysis, a Selected Precedent Transactions analysis, and a discounted cash flow ("DCF") analysis.[76] Catz and Douglas Kehring, Oracle's Chief of Staff, also presented to the Special

---

[70] *Id.*
[71] *Id.* ¶ 115.
[72] *Id.* ¶ 116.
[73] *Id.* ¶ 119.
[74] *Id.* ¶ 113.
[75] *Id.* ¶ 121.
[76] *Id.* ¶ 122.

18

Committee at the meeting, and their presentation included two DCF calculations.[77] The Special Committee decided to offer $100 per share to buy NetSuite.[78]

NetSuite responded to Oracle's offer with a counter-offer of $125 per share.[79] Following NetSuite's counter-offer, the Special Committee met on June 8, 2016 with Moelis, and members of Oracle management (including Catz) present.[80] Management advised the Special Committee to offer $106 per share, and the Special Committee asked Moelis to convey an offer of $106 per share to NetSuite.[81] NetSuite responded by offering $120 per share.[82] On June 14, 2016, the Special Committee met again, at which time management advised the Special Committee not to immediately respond to the counter-offer, and the Special Committee complied.[83]

*E. Oracle and NetSuite Agree to the Acquisition at $109 per Share*

NetSuite's stock price closed at $67.36 per share on June 27, 2016, representing an approximately 15% decline over the course of two trading days.[84] On June 28, 2016, James, Moelis, and Oracle management considered suspending further work on the Acquisition and retracting Oracle's latest offer of $106 per

---

[77] *Id.* ¶ 129.
[78] *Id.* ¶ 121.
[79] *Id.* ¶ 131.
[80] *Id.* ¶ 132.
[81] *Id.*
[82] *Id.* ¶ 133.
[83] *Id.*
[84] *Id.* ¶ 134.

share.[85]  The same day, NetSuite's financial advisor contacted Moelis indicating that "recent market volatility as a result of the vote on Brexit may have created a window of opportunity to come to an agreement on price."[86]  Ultimately, Catz recommended that on June 30, 2016 the parties schedule a due diligence session to review NetSuite's financial results for the just-completed quarter—the Special Committee followed Catz's recommendation.[87]  On July 6, 2016, Oracle management, James, and Moelis had a due diligence call with NetSuite regarding NetSuite's quarterly financial results, but NetSuite did not share certain key financial metrics.[88]

At a July 8, 2016 Special Committee meeting, Catz recommended that the Special Committee request additional meetings between Oracle management and NetSuite, and the Special Committee did so.[89]  Between July 8 and July 12, 2016, Oracle management, led by Catz, held multiple meetings and calls with NetSuite.[90] Oracle's due diligence reflected that NetSuite's "quarter [was] soft" and that there was "some legitimate concerns about the quarter."[91]  On July 12, 2016, the Special Committee convened again and heard a new presentation from Oracle management reflecting the results of additional due diligence, which included new DCF ranges

---

[85] *Id.* ¶ 135.
[86] *Id.* ¶ 136.
[87] *Id.*
[88] *Id.* ¶ 137.
[89] *Id.* ¶ 138.
[90] *Id.*
[91] *Id.* ¶ 139.

with significant reductions in value compared to the May 27, 2016 presentation.[92] The Special Committee decided to reaffirm Oracle's previous offer of $106 per share.[93] Shortly after this meeting, Catz instructed Oracle's management team to "revert to the original," and Oracle management thereafter labeled the newly created projections the "Conservative" case, the prior projections were deemed the "Base" case, and management also created an "Upside" case.[94]

NetSuite made a counter-offer of $111 per share, and the Special Committee met on July 13, 2016 to consider the counter-offer.[95] At the meeting Oracle management presented the "Conservative," "Base," and "Upside" valuations.[96] The valuation ranges presented the previous day—$93.78 to $120.83 per share labeled "DCF (Terminal Value Multiple)" and $53.94 to $115.59 per share labeled "DCF (Perpetuity Growth Rate)"—were again presented, but at this meeting those ranges were labeled "Conservative."[97] The "Base" and "Upside" valuations were also presented, and the DCF Terminal Value range was entirely above $110 per share for "Base" and entirely above $120 per share for "Upside."[98] Catz offered her views to the Special Committee on potential next steps.[99] Thereafter, the Special Committee

---

[92] *Id.* ¶¶ 140, 142.
[93] *Id.* ¶ 141.
[94] *Id.* ¶ 142.
[95] *Id.* ¶ 143.
[96] *Id.*
[97] *Id.*
[98] *Id.*
[99] *Id.*

21

resolved to make a "best and final" proposal at $109 per share.[100]  On July 14, 2016, Goldberg emailed Ellison: "I guess this means… We can start arguing politics again soon!"[101]

Throughout the June and July 2016 negotiations Ellison was permitted to negotiate directly with NetSuite regarding how Ellison would vote his NetSuite shares should NetSuite receive an offer superior to Oracle's.[102]  The Special Committee "opened this direct line of communication" but "did not indicate that any topic was off-limits" and was not informed of back-and-forth negotiations or whether Ellison negotiated any issues directly with NetSuite other than the voting of Ellison's shares.[103]  Ellison ultimately agreed to vote his NetSuite shares proportionately with NetSuite's other stockholders in such a scenario.[104]

NetSuite agreed to Oracle's offer of $109 per share.[105]  On July 27, 2016, the Special Committee met, with Catz and other Oracle management in attendance, to approve a tender offer for NetSuite at the agreed price.[106]  Moelis presented a fairness analysis at the meeting and the TAC alleges that "Moelis' own analyses demonstrated that Oracle's proposed offer of $109 per share significantly overvalued

---

[100] *Id.* ¶ 144.
[101] *Id.* ¶ 145.  I note that the ellipsis is in the TAC and as used here does not denote the omission of text.
[102] *Id.* ¶ 146.
[103] *Id.* ¶ 147.
[104] *Id.*
[105] *Id.* ¶ 148.
[106] *Id.*

NetSuite."[107]  The TAC also alleges that Oracle's management "manipulated" parts of Moelis's analysis, inflating NetSuite's value.[108]  Moelis indicated that it was prepared to provide a fairness opinion at $109 per share.[109]  At the meeting, the Special Committee adopted resolutions to effectuate the Acquisition.[110]  On July 28, 2016, Oracle announced that it would acquire NetSuite for $109 per share.[111]

*F. The Tender Offer and Disclosures*

On August 18, 2016, Oracle filed its Schedule TO and Offer to Purchase (the "Schedule TO and Offer to Purchase.")[112]  On the same day, NetSuite filed its Schedule 14D-9 (the "Schedule 14D-9"), which was signed by Nelson.[113]  Both filings were filed with the Securities and Exchange Commission (the "SEC").  The Schedule 14D-9 stated that the offer price of $109 per share "represents a 62% premium to the trading price at which the Shares closed on June 27, 2016, the last trading day before public speculation and market rumors that NetSuite was potentially the subject of an acquisition transaction involving Oracle[.]"[114]

The Schedule 14D-9 and the Schedule TO and Offer to Purchase identically disclosed the following regarding Catz and Nelson's discussions in January 2016:

---

[107] *Id.* ¶ 156.
[108] *Id.* ¶ 153.
[109] *Id.* ¶ 156.
[110] *Id.* ¶ 157.
[111] *Id.*
[112] *Id.* ¶ 166.
[113] *Id.*
[114] *Id.* ¶ 167.

On January 21, 2016, a senior representative of Oracle indicated to a senior representative of NetSuite that Oracle would be potentially interested in acquiring NetSuite. The senior representative of NetSuite responded that he would need to discuss with the NetSuite Board its willingness to consider an offer to acquire NetSuite.[115]

There was no mention of the price collar of $100 to $125 disclosed in the Schedule 14D-9 or the Schedule TO and Offer to Purchase.[116]

On August 30, 2016, Nelson and NetSuite lead director Steve Gomo met with T. Rowe Price, the largest public stockholder of NetSuite.[117] Nelson was instructed to provide T. Rowe Price only with information that was publicly available and previously disclosed.[118] At the meeting, Nelson described his January 21, 2016 conversation with Catz.[119] On September 6, 2016, numerous portfolio managers from T. Rowe Price co-signed a letter to the board of directors of NetSuite summarizing Nelson's description of the conversation as follows: "In our recent meeting, Mr. Nelson described the initial contact with Oracle as a loose, pre-due-diligence exploratory conversation where a price range of $100–125 was discussed."[120] The letter expressed concern that this price discussion "may have anchored the subsequent discussions."[121]

---

[115] *Id.* ¶ 168.
[116] *Id.* ¶¶ 168–69.
[117] *Id.* ¶ 171.
[118] *Id.* ¶ 172.
[119] *Id.* ¶ 173.
[120] *Id.* ¶ 174.
[121] *Id.*

On September 7, 2016, NetSuite publicly filed the T. Rowe Price letter and indicated that NetSuite's Board had met to discuss the letter.[122] The public filing "did not comment on the accuracy of T. Rowe Price's summary of Nelson's description of his initial conversation with Catz."[123] Additionally, the TAC alleges that NetSuite did not amend the Schedule 14D-9 regarding the details of the conversation with Catz referenced in T. Rowe Price's letter.[124] However, on September 7, 2016, NetSuite amended the Schedule 14D-9 by attaching the T. Rowe Price letter as an exhibit and referencing the public filing of the letter.[125]

On October 27, 2016, T. Rowe Price sent a letter to the Special Committee that referenced the views expressed in its letter to NetSuite's Board from September 6, 2016.[126] Oracle did not amend its Schedule TO and Offer to Purchase to add any details about the Nelson-Catz conversation.[127]

Additionally, NetSuite's Schedule 14D-9 disclosed the following of the conversation between Goldberg and Ellison regarding the future of NetSuite post-Acquisition as follows: "Mr. Ellison indicated his understanding that Oracle would be potentially interested in acquiring NetSuite. He also indicated that he would not

---

[122] *Id.* ¶ 175.
[123] *Id.*
[124] *Id.*
[125] NetSuite Defs.' Reply Br. in Support of Their Mot. to Dismiss Count Two of the Verified Third Am. Derivative Compl., D.I. 332, Ex. J, Amendment No. 1 to the Schedule 14D-9.
[126] TAC, ¶ 176.
[127] *Id.*

seek to influence NetSuite's decision with respect to an acquisition."[128]   The Schedule 14D-9 did not disclose Ellison's commitment that the NetSuite organization would not be harmed in the Acquisition process and that NetSuite would become an intact, freestanding business unit within Oracle.[129]

The Acquisition closed on November 5, 2016.[130]  On November 4, 2016 James emailed the Special Committee and senior executives at Oracle: "This was the #1 thing we said we needed to do for our strategy at last year's offsite and you are now on your way!"[131]

*G. Procedural History*

The Lead Plaintiff filed the original complaint in this Action on July 18, 2017, and filed the TAC on February 18, 2020.[132]   The TAC pleads two counts.  Count One alleges breach of fiduciary duty by Oracle fiduciaries Ellison, Catz, Hurd, Henley, and James (the "Oracle Fiduciaries") in connection with the Acquisition.[133] Count Two alleges that Goldberg and Nelson (the "NetSuite Defendants") aided and abetted the Oracle Fiduciaries' breach of fiduciary duty.[134]  The NetSuite Defendants

---

[128] *Id.* ¶ 13.
[129] *Id.*
[130] *Id.* ¶ 181.
[131] *Id.* ¶ 182.
[132] Two months before the Lead Plaintiff's original complaint was filed, another Oracle stockholder had filed a separate Complaint in this Court challenging the same transaction and, on September 7, 2017, I designated the Lead Plaintiff's original complaint as the operative pleading. *See In re Oracle Corp. Derivative Litig.*, 2019 WL 6522297, at *4 n.91 (Del. Ch. Dec. 4, 2019).
[133] TAC, ¶¶ 201–05.
[134] *Id.* ¶¶ 206–07.

26

have moved to dismiss Count Two of the TAC. I heard Oral Argument on the NetSuite Defendants' Motions on March 11, 2020, and considered the matter submitted for decision on that date.

## II. ANALYSIS

The NetSuite Defendants have moved to dismiss Count Two of the TAC pursuant to Chancery Court Rule 12(b)(6).[135] The standard of review for a Rule 12(b)(6) motion is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[136]

When reviewing a motion to dismiss, the Court may take into consideration documents incorporated into the pleadings by reference and judicially noticeable facts available in public SEC filings.[137]

### A. The Lead Plaintiff's Allegations

The Lead Plaintiff has alleged that the NetSuite Defendants aided and abetted the Oracle Fiduciaries' alleged breaches of fiduciary duty. The elements of aiding and abetting a breach of fiduciary duty are: "(i) the existence of a fiduciary

---

[135] Ch. Ct. R. 12(b)(6).

[136] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

[137] *Reith v. Lichtenstein*, 2019 WL 2714065, at *1 (Del. Ch. June 28, 2019).

relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in that breach by the defendants, and (iv) damages proximately caused by the breach."[138]

The Lead Plaintiff's aiding and abetting claims center on Goldberg's and Nelson's alleged aiding and abetting of Ellison's and Catz's breaches of fiduciary duty. The Lead Plaintiffs "theory of liability" is that "Goldberg and Nelson knew the substance and materiality of their respective early discussions with Ellison and Catz—(*i.e.* a high bargaining range of $100 to $125 per share and social terms that benefitted Goldberg)—but nonetheless caused NetSuite not to record or publicly discuss the substance of those early discussions."[139] Thus, the Lead Plaintiff's theory is that in not causing *NetSuite* to disclose certain details of the early conversations, Goldberg and Nelson were participating in a "conspiracy of silence" that prevented *Oracle's* Special Committee and other directors from learning the substance of such conversations.[140]

The Lead Plaintiff alleges that had these Oracle parties learned the truth, it is "an open question whether Oracle would have gone forward with the tender offer if the outside directors had obtained credible information that Catz had concealed her

---

[138] *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 861 (Del. 2015) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

[139] Pl.'s Answering Br. in Opp'n to NetSuite Defs.' Opening Br. in Support of Their Mot. to Dismiss Count Two of the Third Am. Derivative Compl., D.I. 328 (Pls.' Answ. Br."), at 21.

[140] *See* Oral Arg. Tr., at 28:5–28:10 ("Okay. But just to be clear, the theory is the Oracle side would have the ability to walk if it was fully disclosed later. And by the NetSuite people not disclosing it, they took away from the Oracle side the ability to walk . . . .").

secret price discussions from the Board."[141] The Lead Plaintiff further argues that "[c]orrective disclosures of material facts about the early discussions may have prompted more scrutiny of the transaction and impacted investors' trading strategies and tendering decisions, as well as investigative action and potential drastic steps by Oracle's Board to remedy the fraud perpetrated on them by Ellison and Catz."[142] Had NetSuite's disclosures told the whole story, per the Lead Plaintiff, it would have set in motion a cascade of events that would have stymied Ellison and Catz's scheme for Oracle to acquire NetSuite at an inflated price.

*B. Knowing Participation as an Element of Aiding and Abetting*

For the aiding and abetting claims to survive this motion to dismiss stage, it must be reasonably conceivable that the NetSuite Defendants knowingly participated in the alleged breaches of fiduciary duty by the Oracle Fiduciaries.[143] "Because the involvement of secondary actors in tortious conduct can take a variety of forms that can differ vastly in their magnitude, effect, and consequential culpability, the element of 'knowing participation' requires that the secondary actor have provided 'substantial assistance' to the primary violator."[144] This requirement,

---

[141] Pls.' Answ. Br., at 25 (internal quotation marks omitted).
[142] *Id*. at 26–27.
[143] *See RBC*, 129 A.3d at 861; *In re Xura, Inc. S'holder Litig.*, 2019 WL 3063599, at *3 (Del. Ch. July 12, 2019)).
[144] *In re Dole Food Co., Inc. S'holder Litig.*, 2015 WL 5052214, at *41 (Del. Ch. Aug. 27, 2015) (citing *Kuhns v. Bruce A. Hiler Delaware QPRT*, 2014 WL 1292860, at *21 (Del. Ch. Mar. 13, 2014)).

that an alleged aider-and-abettor must have provided "substantial assistance" for liability to attach, emanates from Section 876(b) of the Restatement (Second) of Torts (the "Restatement").[145] The Restatement's comments to Section 876(b) state: "If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act."[146] Thus, the secondary actor must have provided "assistance . . . or participation" in aid of the primary actor's allegedly unlawful acts.[147] Whether a secondary actor knowingly provided substantial assistance is "necessarily fact intensive."[148] In its inquiry, the court may consider, among other factors, "[t]he nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects" and "[t]he amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct."[149] To withstand a motion to dismiss, a plaintiff must plead facts making it reasonably conceivable that the defendant knowingly

---

[145] Restatement (Second) of Torts § 876(b) (1979). Section 876(b) of the Restatement has been cited with approval in this Court and in the Delaware Supreme Court. *See Malpiede v. Townson*, 780 A.2d 1075, 1097 n.78 (Del. 2001); *Dole*, 2015 WL 5052214, at *41–42; *Xura*, 2019 WL 3063599, at *3.

[146] Restatement (Second) of Torts § 876 cmt. d (1979).

[147] *Id*.

[148] *Dole*, 2015 WL 5052214, at *42.

[149] *Id*.

supported a breach of duty *and* that his resulting assistance to the primary actor constituted substantial assistance in causing the breach.

*C. The NetSuite Defendants Did Not Provide Substantial Assistance*

The Lead Plaintiff alleges that the NetSuite Defendants caused NetSuite to fail to disclose the substance of (i) the Nelson-Catz January 21, 2016 discussion (the "Price Collar Discussion") and (ii) the Goldberg-Ellison discussion regarding the survival of NetSuite post-Acquisition (the "NetSuite Discussion"). The Lead Plaintiff alleges that such disclosures would have put Oracle's directors on alert to the allegedly lopsided terms, and would have led Oracle to scuttle the deal. Because such disclosure would have thwarted Ellison and Catz's scheme, the Lead Plaintiff alleges that the NetSuite Defendant's silence constituted substantial assistance to the Oracle Fiduciaries' breach of duty.

Before turning to that analysis, it is important to note the duty that, according to the Lead Plaintiff, the NetSuite Defendants have breached. Absent a fiduciary or contractual relationship, "Delaware law generally does not impose a duty to speak."[150] The TAC *does not* plead that such a relationship existed between the NetSuite Defendants and the injured parties at *Oracle*. Thus, upon first glance, even if the NetSuite Defendants believed that the Oracle Defendants intended to breach

---

[150] *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007) (citing *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 150 (Del. 1987)).

31

fiduciary duties to Oracle, Delaware law recognizes no affirmative duty of the NetSuite Defendants to so inform Oracle, its fiduciaries, or its stockholders.

Implicitly conceding that the NetSuite Defendants did not owe Oracle or its stockholders an affirmative duty to speak, the Lead Plaintiff's theory of liability is *not* that the NetSuite Defendants breached such a duty. Instead, the NetSuite Defendants' liability to the Plaintiffs here requires that they undertook action to provide substantial aid to Ellison and Catz to facilitate those Defendants' breach of their own duties to Oracle—the alleged substantial aid was silence. But, given the general unwillingness of our law to impose a duty to speak, how could mere silence be cognizable as substantial assistance in tortious aiding and abetting?

Confronting this question, the Lead Plaintiff must identify an obligation of the NetSuite Defendants to speak. To this end, the Lead Plaintiff points out that the NetSuite Defendants did owe fiduciary duties to make disclosures to *NetSuite* stockholders in way of the Acquisition.[151] The Lead Plaintiff posits that the NetSuite Defendants breached those duties in aid of the secrecy necessary to Ellison and Catz's corrupt scheme. That is, the disclosures required of the NetSuite Defendants to NetSuite's stockholders would, if made, result in disclosure to the public, which

---

[151] *See Raul v. Astoria Fin. Corp.*, 2014 WL 2795312, at *8 (Del. Ch. June 20, 2014) ("Under Delaware law, directors owe a fiduciary duty to fully and accurately disclose all material information to stockholders when seeking stockholder action, which duty arises out of a director's duties of both loyalty and care." (footnotes and quotation marks omitted)).

would in turn result in disclosure to Oracle's Special Committee. Ellison and Catz's scheme required that the latter disclosure be prevented. Under this theory, the claims of Oracle's stockholders ride the coattails of the duties owed to the stockholders of their acquisition target,[152] without regard to whether the target stockholders were themselves harmed by such breach.[153] Thus, to succeed on its aiding and abetting claims the Lead Plaintiff must show: (1) that the NetSuite Defendants intentionally breached a duty owed to NetSuite and its stockholders *and* (2) in doing so substantially assisted a breach of duty to Oracle.[154] To survive the NetSuite Defendants' Motions to Dismiss, the facts averred by the Lead Plaintiff must make the forgoing reasonably conceivable.

This requires not only a pleading that reasonably implies that the NetSuite Defendants' fiduciary duties to NetSuite and its stockholders required that they cause NetSuite to disclose the Price Collar Discussion and the NetSuite Discussion, but also that the NetSuite Defendants intentionally violated such duties in furtherance of the Oracle Defendants' breach of duty to Oracle. Again, the Lead

---

[152] While the breach of duty to speak by the NetSuite Defendants alleged in the TAC is a breach of a duty of disclosure to NetSuite, one could envision other duties—such as those under federal securities laws—that an acquirer's stockholders could seek to import to allege that a defendant is liable for aiding and abetting due to a failure to speak.

[153] In fact, the Lead Plaintiff's theory is that NetSuite's stockholders benefitted from the scheme.

[154] The incongruity of the Lead Plaintiff's theory crystallizes when one considers that the NetSuite Defendants contemporaneously had a duty to "get the best price for the stockholders at a sale of the company." *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 242 (Del. 2009) (quoting *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 182 (Del. 1986)) (internal alterations omitted).

33

Plaintiff's theory is that the NetSuite Defendants intentionally breached a duty of candor to NetSuite stockholders, because compliance with this duty would have also informed the public, and ultimately Oracle's Special Committee, imperiling the overpayment scheme. But under the facts alleged, I find that I need not determine whether the NetSuite Defendants breached a duty to NetSuite's stockholders. That is because even if the NetSuite Defendants did breach a duty to disclose, it is not reasonably conceivable that by their silence they provided substantial assistance to the Oracle Fiduciaries' alleged breaches of fiduciary duty, in light of the actual disclosures of record.

### 1. The Price Collar Discussion

The Lead Plaintiff's primary contention involves concealment of the price collar. The TAC alleges that the NetSuite Defendants provided substantial assistance to Ellison and Catz by not causing NetSuite to disclose the substance of the Price Collar Discussion. To this point, the discussion of a price range of $100–$125 *was not* included in the original Schedule 14D-9.[155] However, after the Schedule 14D-9 was filed, Nelson did disclose the Price Collar Discussion to T. Rowe Price, a large blockholder of NetSuite stock, leading T. Rowe Price to write a letter to NetSuite's Board expressing concerns about the Acquisition (the "T. Rowe

---

[155] *See* Transmittal Aff. of E. Wade Houston, Esq., D.I. 290 ("Houston Aff."), Ex. F, NetSuite Schedule 14D-9 ("Schedule 14D-9").

Price Letter"). T. Rowe Price's concern was that the Price Collar Discussion was unfair to *NetSuite's* stockholders because it cabined NetSuite's price at a level unfairly *low*.[156] NetSuite publicly filed the T. Rowe Price Letter with the SEC as an attachment to a Form 8-K the day after the letter was written.[157] The Form 8-K itself stated that "[o]n September 6, 2016, the Transactions Committee of [NetSuite's] Board of Directors and [NetSuite's] Board both met to discuss the letter. [NetSuite's] Board unanimously reaffirmed its recommendation that stockholders accept Oracle's offer and tender their shares."[158]

> Regarding the Nelson-Catz conversation, the T. Rowe Price Letter states:
>
> In our recent meeting, Mr. Nelson described the initial contact with Oracle as a loose, pre-due-diligence, exploratory conversation where a price range of $100–$125 was discussed. We don't think it's a coincidence that the final agreement ended up very close to the midpoint of that range. We are concerned that this initial conversation —which by your account came as a surprise to NetSuite —may have anchored the subsequent discussions. This anchoring effect, in combination with the disincentives for other bidders to come forward, may have prevented full price discovery. We were disappointed to see in the tender offer document that NetSuite did not undertake an outbound market check with inquiries to other logical purchasers before agreeing to Oracle's offer.[159]

---

[156] Houston Aff., Ex. G, NetSuite Form 8-K Filed September 6, 2016, Ex. 99.1 ("T. Rowe Price Letter"), at 1–2.
[157] Houston Aff., Ex. G, NetSuite Form 8-K Filed September 6, 2016.
[158] Houston Aff., Ex. G, NetSuite Form 8-K Filed September 6, 2016, Item 8.01.
[159] T. Rowe Price Letter, at 2.

When presented with this public disclosure of the supposedly clandestine Price Collar Discussion, the Lead Plaintiffs' response is that the 8-K is "not an affirmative disclosure by NetSuite of what Catz and Nelson actually said" and that it was "not part of the tender offer materials" and "did not bind NetSuite, much less induce Oracle to make a parallel disclosure."[160] But in addition to the 8-K NetSuite *did* make the T. Rowe Price Letter part of the tender offer materials by amending the Schedule 14D-9 and attaching the T. Rowe Price Letter as an exhibit.[161]

Upon review of these NetSuite public filings, it is, to my mind, not reasonably conceivable that the NetSuite Defendants could have provided substantial assistance to Ellison and Catz by failing to disclose the Price Collar Discussion to NetSuite's stockholders, and thus to the public. This is because the disclosure of the T. Rowe Price Letter by NetSuite contained the relevant substance of the Price Collar Discussion, *i.e.* that Nelson and Catz had discussed a price range *before* Oracle's Special Committee was constituted, and after Oracle's Board had specifically instructed Catz "not engage in any price discussions" with NetSuite.[162] I cannot make the inference that the Form 8-K and amended Schedule 14D-9 disclosures were insufficient to alert those on the Oracle side of the Price Collar Discussion, but

[160] Pls.' Answ. Br., at 25–26.
[161] NetSuite Defs.' Reply Br. in Support of Their Mot. to Dismiss Count Two of the Verified Third Am. Derivative Compl., D.I. 332, Ex. J, Amendment No. 1 to the Schedule 14D-9.
[162] TAC, ¶ 77.

*also* that disclosure by some other method would have been sufficient to bring the matter to Oracle's attention. Furthermore, even if the NetSuite Defendants had been trying to keep the Price Collar Discussion secret, and, assuming it was unknown by Oracle's Special Committee and directors until NetSuite's disclosures, it is not reasonably conceivable that the NetSuite Defendants ultimately provided assistance to or participation in Ellison's and Catz's alleged breaches of duty, because after NetSuite's disclosures the Price Collar Discussion was *no longer a secret*.

It is important to keep in mind that the liability of the NetSuite Defendants here does not turn simply on whether they complied with fiduciary duties to *NetSuite* and *its* stockholders in regard to the proxy disclosures. Even assuming that fact, the NetSuite Defendants can be held in this Action only if it is also reasonably conceivable that they substantially assisted the *Oracle Fiduciaries* breach of duty to *Oracle*. The Lead Plaintiff's counter to my finding above is that the disclosure of the T. Rowe Price Letter was insufficient because it was not an affirmative disclosure by NetSuite of what Nelson and Catz actually said. This is unavailing, because the Lead Plaintiff's theory does not hinge simply on a breach of duty to NetSuite. There are, of course, certain circumstances—typically involving direct rather than secondary liability for breach of fiduciary duties—where affirmative statements by an acquisition target on the 14D-9 itself must be the focus of the court's analysis.[163]

---

[163] *E.g. Morrison v. Berry*, 191 A.3d 268 (Del. 2018).

But bearing in mind how the Lead Plaintiff has pled its case, whether the disclosures complied with the NetSuite Defendants' fiduciary duties to NetSuite is irrelevant if the disclosures nonetheless were sufficient to alert those on the Oracle side of the Price Collar Discussion. It is not reasonably conceivable that the disclosure of the Price Collar Discussion by NetSuite in *two separate SEC filings* did not, at a minimum, disclose to the public and to Oracle that Catz and Goldberg discussed a price collar when Catz was not authorized to discuss price and before the Special Committee was constituted. Moreover, it is not reasonably conceivable that such a public disclosure failed to find the Oracle Special Committee, who had a duty to gather information pertinent to whether Oracle was overpaying for NetSuite.

Thus, regardless of whether the NetSuite Defendants' disclosures of the Price Collar Discussion comported with their fiduciary duties to *NetSuite*, the NetSuite Defendants' actions cannot have provided substantial assistance to Ellison and Catz's breach of duty, because the alleged attempt that the NetSuite Defendants made to keep the Price Collar Discussion secret from Oracle failed. It is not reasonably conceivable that the difference between what was disclosed and what the Lead Plaintiff alleges should have been disclosed constituted substantial assistance to Ellison and Catz's scheme to cause Oracle to overpay for NetSuite.

38

## 2. The NetSuite Discussion

The Lead Plaintiff also alleges that the NetSuite Defendants aided and abetted Ellison's and Catz's alleged breaches of fiduciary duty by not causing NetSuite to disclose the substance of the "NetSuite Discussion," which concerned Ellison's commitment to Goldberg to keep NetSuite intact post-closing.[164] Pursuant to the NetSuite Discussion, Goldberg allegedly "secured an undisclosed understanding from Ellison about how an acquisition would work" by February 3, 2016, *before* the Special Committee was even constituted.[165] The Lead Plaintiff alleges that after the NetSuite Discussion, the general terms of the Acquisition were set, rendering the negotiations between the respective special committees of Oracle and NetSuite a *fait accompli*. But, per the Lead Plaintiff, revelation of the details of the NetSuite Discussion to the Oracle Special Committee could have caused the Special Committee to repudiate the sale. Therefore, concealment of the NetSuite Discussion was necessary to Ellison and Catz's scheme. The NetSuite Defendants allegedly breached duties to NetSuite's' stockholders in order to conceal the NetSuite Discussion from the public and, ultimately, the Oracle Special Committee.

NetSuite publicly disclosed the alleged substance of the NetSuite Discussion on numerous occasions. In NetSuite's July 28, 2016 press release announcing the

---

[164] It is unclear whether Nelson is included in this allegation or it is against Goldberg alone, but for purposes of this analysis, I assume the allegation is against both.
[165] TAC, ¶¶ 92, 94, 105.

Acquisition, Mark Hurd is quoted as saying: "Oracle and NetSuite cloud applications are complementary, and will coexist in the marketplace forever. . . . We intend to invest heavily in both products — engineering and distribution."[166] In a publicly filed letter to customers on July 29, 2016 *signed by Goldberg and Nelson*, NetSuite states: "Oracle is committed to protecting and enhancing customer investments in NetSuite solutions. After the close of the transaction, Oracle plans to accelerate the pace of investment in NetSuite functionality and capabilities."[167] Thus, it was no secret at the time the parties agreed to the Acquisition that Oracle intended for NetSuite to function as an independent business unit. Goldberg and Nelson could not have provided substantial assistance by failing to disclose the *substance* of the NetSuite Discussion because such information was already public.

But the Lead Plaintiff's also raises concerns about non-disclosure of the timing of the NetSuite Discussion. The Lead Plaintiff argues that by not disclosing that Goldberg and Ellison had such a discussion early on in the process, and before any formal negotiations, the NetSuite Defendants enabled Ellison and Catz to perpetrate a charade whereby it appeared to the public—and Oracle's Special Committee—that the Acquisition was being negotiated by special committees but

---

[166] Houston Aff., Ex. A, NetSuite Press Release: Oracle Buys NetSuite, at 1. This press release was an exhibit to a NetSuite SEC filing.
[167] Houston Aff. Ex. D, NetSuite Letter to Customers, at 1.

40

that, in reality, the principals had already come to a basic understanding in advance.

NetSuite's Schedule 14D-9 refutes such a narrative. The Schedule 14D-9 states:

> [O]n January 27, 2016, in response to a desire expressed by Mr. Goldberg to speak to Mr. Ellison to understand Oracle's interest in a possible acquisition, Messrs. Goldberg and Ellison spoke. Mr. Ellison indicated his understanding that Oracle would be potentially interested in acquiring NetSuite. He also indicated that he would not seek to influence NetSuite's decision with respect to an acquisition.[168]

Therefore, it was *no secret* to Oracle that Goldberg and Ellison had a conversation regarding the Acquisition early in the process. The Lead Plaintiff may argue that the NetSuite Defendants had a duty to their stockholders to disclose more about the conversation, but, again, that is not the crucial inquiry here. Even if the NetSuite Defendants breached a duty owed to NetSuite's stockholders, the inquiry is whether it is reasonably conceivable that the NetSuite Defendants provided substantial assistance to Ellison's and Catz's alleged breaches of fiduciary duty by hiding the NetSuite Discussion from Oracle via deficiencies in NetSuite's securities filings. I find that it is not reasonably conceivable that the NetSuite Defendants could have provided assistance or participation to Ellison and Catz in this regard because the substance of the NetSuite Discussion (that NetSuite would be kept intact) and the fact that a discussion occurred between Ellison and Goldberg on January 27, 2016 *were publicly disclosed by NetSuite*. Such public disclosures were obtainable by the

---

[168] Schedule 14D-9, at 18.

41

party with the most incentive to inform itself of flaws in the bargaining process: the Oracle Special Committee. As with the Price Collar Discussion, it is not reasonably conceivable that the difference between what was disclosed and what the Lead Plaintiff alleges should have been disclosed regarding the NetSuite Discussion constituted substantial assistance to Ellison and Catz's scheme to cause Oracle to overpay for NetSuite.

\* \* \*

By the time the Schedule 14D-9—including the challenged disclosures of the NetSuite Discussion and the Price Collar Discussion—issued, Oracle's Special Committee had already approved the tender offer. Sticking with the Lead Plaintiff's theory of liability—that had the NetSuite Defendants disclosed more, it could have led those on the Oracle side to scuttle the Acquisition before it closed—all the information existing that the Lead Plaintiff insists was necessary to such a reassessment had been disclosed in securities filings while the tender offer was still outstanding. Thus, the NetSuite Defendants could not have provided substantial assistance to Ellison and Catz because it is not reasonably conceivable that if only the NetSuite Defendants had ensured additional disclosures Oracle's Special Committee and directors would have put the kibosh on the Acquisition. The disclosures made are sufficient to make the Lead Plaintiff's theory of substantial assistance not reasonably conceivable.

42

## III. CONCLUSION

The NetSuite Defendants motion to dismiss Count Two of the TAC is GRANTED. The parties should submit a form of order consistent with this Memorandum Opinion.